KATHERINE M. COWDREY

*v.*

ALBERT E. COWDREY et al.

[Submitted May 1st, 1906. Decided June 15th, 1906.]

1. In an action by a widow to recover land, under a writing by her deceased husband, from his heirs, whom she does not attempt to hold personally liable, the widow is a competent witness as to transactions with her husband.

2. In a suit in equity by a widow to recover land under a writing given by her husband, whereby he gave her a house and lot, evidence of an antenuptial oral promise by him, in consideration of marriage, to give her the house, and evidence of payments to her of rent on the house after marriage and before the execution of the writing, were admissible to show the actual state of affairs between the parties.

3. An unsealed writing by a husband, reciting that he gave his wife a certain house and lot, the writing being executed in pursuance of an antenuptial oral promise in consideration of marriage, is sufficient to authorize the recovery of the property by the widow by a suit in equity.

4. Evidence *held* to show that a husband executing an instrument giving his wife a house and lot had mental faculties and judgment for its execution.

5. Where a husband handed to his wife a writing executed by him, giving her a house and lot for a consideration of $1, which she actually paid him, the fact that she afterwards returned the writing to him for keeping does not affect the validity of the delivery.

6. Under the act of March 24th, 1899 (*P. L. 1899 p. 531 § 2*), as amended by the act of April 9th, 1902 (*P. L. 1902 p. 688*), providing that the word "heirs" shall not be necessary in a deed to effect a conveyance of the fee-simple, a writing executed by a husband, reciting that he gave his wife, for the sum of $1, a house and lot, was sufficient to entitle her to a fee-simple estate therein.

23

7. Where a husband, at the age of eighty-four years, executed an unsealed writing giving to his wife the most valuable of the three houses which he owned, equity will impose, as a condition to giving her the fee-simple title thereto, that she release her dower in the other houses.

On final hearing on bill, answer and proofs.

*Mr. Edwin B. Goodell,* for the complainant.

*Mr. Philemon Woodruff* and *Mr. Alfred F. Stevens,* for the defendants.

PITNEY, V. C.

The object of this suit is to establish an equitable title in the complainant in a certain house and lot in East Orange, New Jersey.

The complainant claims such title by reason of an instrument in writing, dated November 14th, 1904, and signed by her late husband, Edward M. Cowdrey.

The defendants are the heirs-at-law of the said Cowdrey in possession of the premises, and by their answer put in issue the complainant's allegations as to the genuineness of the paper writing set forth in her bill, and set up that if it is a genuine writing it has no legal force or effect whatever, and further that it was procured by the petitioner from her late husband by improper and undue influence at a time when his faculties and will were weakened by advanced age and general debility.

At the hearing the instrument was produced by the complainant, and it was abundantly proven that it was wholly in the handwriting of the deceased.

It is in these words: "I give to my wife Katherine M. Cowdrey for the sum of $1 house 79 Washington St. East Orange, Nov. 14th 1904. E. M. Cowdrey. Witness Emily P. Coleman."

In order to fully establish her case, the complainant offered herself as a witness as to conversations and transactions with her husband, and her evidence was admitted, subject to timely objections by the defendants.

Two questions then arise upon the record.

*First.* The competency of the complainant as a witness; and *second,* the value of the paper under all the circumstances, and its efficacy in establishing an equitable title in the complainant.

The first question was ably and, to my mind, satisfactorily dealt with by Vice-Chancellor Emery in *McKinley* v. *Coe, 66 N. J. Eq. (21 Dick.) 70 (April, 1904),* and under that opinion and decision I should feel constrained to consider the evidence as competent but for the doubts expressed, without any actual decision, by Vice-Chancellor Stevens in the case of *Kleb* v. *Kleb, 70 N. J. Eq. (4 Robb.) 305 (Nov., 1905).*

I infer from the opinion in the later case that the attention of the learned vice-chancellor had not been called to the earlier opinion of Vice-Chancellor Emery just referred to.

Vice-Chancellor Emery's decision was necessary for the decision of the matter involved, while, in Vice-Chancellor Stevens' case, the determination of the question was not necessary for his decision. This circumstance renders it highly probable that he did not know of the earlier decision of Vice-Chancellor Emery's.

I think the true criterion to be applied is one which will probably reconcile all the cases, and I find it clearly pointed out in Vice-Chancellor Emery's opinion, and that is: Does the judgment or decree asked for by the plaintiff or complainant seek to charge the heir-at-law with' a personal liability by reason of his or her being an heir-at-law, or does it make him or her a party simply because he or she is in possession as *terre tenant* of land claimed by the complainant or plaintiff, substantially as a grantee of the land from the original owner might be in possession claiming title?

An illustration of the former case is found in *Joss* v. *Mohn, 55 N. J. L. (26 Vr.) 407 (1893).* That was an action by a creditor of the ancestor against the heir-at-law to recover an alleged debt due from the ancestor under the statute making the heir-at-law liable for such debts to the extent of lands descended to him. The judgment in such case is *in personam.*

On the other hand is the case of *Hodge* v. *Coriell, 44 N. J. L. (15 Vr.) 456; affirmed, 45 N. J. L. (17 Vr.) 354 (1882).* There the plaintiff claimed title to certain chattels which he found in

the possession of the defendant and sued the defendant, in replevin, to recover the same. The defendant set up a title as executor of a person who, he claimed, owned the chattels in his lifetime. The court held the evidence of the plaintiff to be competent to prove declarations by the testator as to the title. There, it will be observed that if the defendant had disclaimed ownership he would not have been liable even for costs; and if he permitted the chattels to be delivered to the plaintiff under the writ of replevin he would be liable only for costs and damages for detention, even if he failed in his defence.

He was made a defendant simply because he was in possession of the chattels claiming ownership.

The language of the learned chief-justice (at the bottom of *p. 457*) seems to me worthy of transcription here: "If, therefore, the theory is to be resorted to that in this instance the defendant is sued in his representative capacity, it can be not with a view of strengthening the plaintiff's remedy, but merely to work the defendant's exclusion as a witness. It may be that the interest of the party in the cause of action, by reason of his being the representative of a decedent, rather than his status as a party suing or being sued, would, in some respects, be the better criterion for the exclusion of the adverse party. But such a rule would be open to the objection that the application of the criterion would depend not on a patent circumstance, such as the attitude of a party on the record, but on the latent fact of an interest subject to dispute and which might not appear until the later stages of the trial."

The case of *Palmateer* v. *Tilton, 40 N. J. Eq. (13 Stew.) 555,* is instructive. There the complainant brought a suit to enforce by specific performance a contract for the purchase of land entered into with one Allen as executor of Harvey under a power in the will of the latter. After the alleged contract was made, Allen, the executor, died and Tilton was appointed administrator *cum testamento annexo* of Harvey, and was made defendant by reason thereof. The court of errors and appeals went out of its way to hold that the complainant, Palmateer, was a competent witness to prove the contract alleged to have been made between him and Allen, the original executor of Harvey.

Then we have the case of *Crimmins* v. *Crimmins, 43 N. J. Eq. (16 Stew.) 86 (1887).* That was a suit brought by a widow against the heirs-at-law of her deceased husband, the object of which was to set aside a conveyance or conveyances of land executed by her, by means of which her interest in certain real estate became vested in her husband. And it was held that her evidence respecting transactions with her husband and statements made by him were competent. That was a decision by Vice-Chancellor Van Fleet in which he treated *Colfax* v. *Colfax, 32 N. J. Eq. (5 Stew.) 206 (1880),* as overruled by the two later cases just cited.

Now these three cases, *Crimmins* v. *Crimmins, Hodge* v. *Coriell* and *Palmateer* v. *Tilton,* were all cited with approval by Justice Scudder, speaking for the court of errors and appeals in *Smith* v. *Smith, 52 N. J. L. (23 Vr.) 207 (at p. 210).*

That was a suit at law by a widow, or person claiming to be such, against the lessees and devisees in fee of her late husband to recover dower in lands of which he died seized, and the court held her competent to prove her marriage ceremony with the decedent testator and lessor, and cited in support of its opinion the cases just mentioned. Here, clearly, she did not claim as representative of her husband but under an original title arising out of the marriage contract.

These cases were again followed by Chancellor McGill in *Vreeland* v. *Vreeland, 53 N. J. Eq. (8 Dick.) 386 (1895).* That was an action by the complainant to enforce a specific performance of a parol contract made between him and his father for the conveyance to him of a certain parcel of real estate. At the bottom of *p. 390* the chancellor says: "The complainant testified that he gave up his home in Paterson, went upon the farm to live and sacrificed his business in the execution of an agreement between him and his father, and also to the terms of that agreement.

"That he was a competent witness touching those matters, in this suit, where the defendants are not sued in a representative capacity but for property to which they hold title descended to them from their father, is settled. *Hodge* v. *Coriell, 44 N. J. L. (15 Vr.) 456; Palmateer* v. *Tilton, 40 N. J. Eq. (13 Stew.) 555; Crimmins* v. *Crimmins, 43 N. J. Eq. (16 Stew.) 86;*

*Smith* v. *Smith, 52 N. J. L. (23 Vr.) 210."* And he decreed specific performance on the strength of the evidence. The case is stronger than the one under consideration in that it asked that the defendants should convey to the complainant the property in question, and complainant asserted only that sort of an equitable title which arises out of a parol contract for the sale of land *in futuro* where the consideration has been paid, while here the complainant claims that the title passed to her in equity *eo instanti* at the very moment the paper was executed and delivered.

In so far as I said or decided anything in *Greenwood* v. *Henry, 52 N. J. Eq. (7 Dick.) 448,* to the contrary of the foregoing cases, I was clearly in error.

The case of *Kempton* v. *Bartine, 59 N. J. Eq. (14 Dick.) 149 (1899),* can hardly be considered as overruling any of the cases previously cited, especially since, on appeal *(60 N. J. Eq. (15 Dick.) 411),* the court of errors and appeals very carefully abstained from expressing any opinion upon it.

In what I have thought it worth while to say on this subject I have simply followed Vice-Chancellor Emery in adopting the distinction which is taken by Vice-Chancellor Reed in *Wycoff* v. *Norton, 60 N. J. Eq. (15 Dick.) 477 (1900),* and I should not have spent so much time and space except out of respect for the views expressed by Vice-Chancellor Stevens in *Kleb* v. *Kleb.*

In my judgment the present suit is not within the letter or the spirit of the act which excludes the testimony of a party to a transaction with, and admissions by, a deceased party whose representatives are parties to the suit. Its object is not to establish a debt against the decedent or any pecuniary liability against the defendants or either of them, and, as before stated, they are made defendants simply because they are *terre tenants.*

It is true, and it should be mentioned here, that the bill does pray that

"the defendants may be decreed to make, execute and deliver to your oratrix all such papers of whatsoever nature as may be necessary to protect the title of your oratrix in and to the said premises, and to insure her enjoyment of the same during the term of her natural life, and that she may have other relief," &c.

Now this prayer for the execution of papers to protect title means, of course, to perfect the legal title of record and such relief is not at all necessary to the complainant's complete relief. The decree of this court, declaring that she is entitled in equity to such title, executed by putting her in possession, is all that is at all necessary for her relief, so that that part of the prayer of her bill may be stricken out and disregarded. By this remark, however, I do not mean to decide that if such relief be necessary it would alter the result to which I have arrived on this part of the case, since the decree prayed for would not after all, in my judgment, be a decree *in personam* against the defendants as heirs-at-law, but simply because they are in possession claiming title.

The examination of the authorities has led me, contrary to my first impressions, to the opinion that complainant's evidence was competent.

The complainant was married to her late husband on the 15th day of June, 1896. He was then a widower seventy-six years of age, living in Montclair, New Jersey. At that time he was seized of three tracts of land, with houses upon them, adjoining each other, in the city of East Orange, besides some personal property. The parties first met at a boarding-house in Montclair, kept by a Mrs. Hedges. The deceased had been boarding there some time when the complainant came to board there with her father and mother, Mr. and Mrs. Bodine, and the complainant's sister, Mrs. Coleman. .

The deceased soon afterwards made matrimonial advances to the complainant, and, as an inducement and consideration to her to marry him, promised to give her the house here in question, 79 Washington street, East Orange, which was the larger of the three houses owned by the deceased and distinguished as such.

This promise is proven, not only by complainant, but by her sister, Mrs. Coleman,. and by the boarding-house keeper, Mrs. Hedges, and I am satisfied, by the proofs, that as a matter of fact the promise to convey did enter into the consideration of the marriage.

As a further proof of the sincerity and for the purpose, as he said, of binding the bargain, the future husband, before the

marriage, drew from the bank $75, the precise amount of one month's rent of the house, and paid it to the complainant.

After the marriage he asked her to submit to a reduction of the amount paid for rent, and he actually paid her $25 each and every month from that time on until his death.

These payments are proven by his checks actually produced by the complainant.

This evidence of pre-marriage contract and payment was all seasonably objected to as valueless under the statute of frauds, but was admitted by me as showing the actual state of affairs between the parties.

They continued to live together until he died, a few months after the date of the instrument in question, the complainant all the while performing her duties as an affectionate and dutiful wife.

The circumstances attending the execution of the paper in question are these: Up to about a year before he died, the husband had been able to collect his own rents and attend to his own outdoor business, but at the date of the instrument in question he was unable to go out, and the complainant was in the habit of attending to some of that work for him. On the day of the date of the instrument he asked complainant to go over to East Orange to attend to some repairs that were needed on his property there, and the complainant felt disinclined to go and told her husband that it was too much trouble, and then he said: "You know I always promised you that house, Katherine, didn't I?" To which she answered, "Yes, but I never saw the house," meaning the deed for the house. She did go to the property and attend to the business as requested by him, and on her return he showed her the paper writing here in question already signed, and he told her he would give it to her for one dollar, and asked her to get her sister, Mrs. Coleman, to witness it. She went for Mrs. Coleman and told her what he wished, and Mrs. Coleman came to his room, found the paper in the husband's hand, he handed it to her, and she at once signed her name as witness and handed it back to him. So far as appears nothing was said by any party on the occasion of the actual signature of the witness, but the handing up of the paper by the husband to

Mrs. Coleman, and her signature in his presence and the acceptance of it from her by him, amounted in effect to a request by him to her to witness it.

Immediately thereafter complainant followed Mrs. Coleman to her room and procured from her one dollar, which she took back and gave to her husband and received from him the paper in question.

Up to that moment she had not known the contents of the paper. She read it and kept it two or three days, when, at his suggestion, she handed it back to him to keep for her, as she supposed, with her other valuables, such as jewelry, &c., in a safe deposit vault in the bank.

She never saw it again until after his death, when she found it in a pocket of his vest.

These are the special circumstances, and I will say here that I believe the complainant was entirely truthful and that her evidence was not in the least exaggerated or colored.

The deceased was a cultivated, educated business man, the son of a lawyer, and must be presumed to have known, or at least thought he knew, what was necessary in order to complete the gift of the house to his wife.

Further, he was, although feeble, in possession of his faculties to a degree quite sufficient for the transaction of the business in hand, and there is not the least ground to believe that any improper influence was brought to bear upon him by his wife or anyone in her behalf. I will refer to this again.

Let us now consider what is the value of this paper.

Its invalidity at law as a conveyance from the husband directly to his wife, if there be a consideration, vanishes in this court and may be entirely disregarded.

Now the intention of the signer of the contract is plain.

It was further his intention that such a gift should be made for a consideration. This is reasonably inferable from the use of the words "for the sum of one dollar" and his requiring the actual payment of one dollar.

He intended then to give her the house for a consideration.

And further, I infer that he must have thought that a consideration was necessary and that one dollar was sufficient.

Further, the instrument is not executory in its nature. It was not a promise to do something in the future. The intention was to effect a present transfer of the title.

But the donor does not express or manifest any intention to affix a seal or to give the paper the dignity and standing of a sealed instrument.

In *Conover* v. *Brown, 49 N. J. Eq. (4 Dick.) 156* (at *p. 169 et seq.*), I spent some time and space in investigating and considering the value of a seal to a contractual instrument, and came to the conclusion that, of late years, the importance of a seal and its value in such transactions had very much diminished, and that it had come to be looked upon as a mere mode by which the party executing the paper was enabled to declare that it should be binding without regard to the actual consideration. *Aller* v. *Aller, 40 N. J. L. (11 Vr.) 446*. And for many years it has been held that even in the case of conveyances of interest in real estate, made for a valuable consideration and expressing an intention to seal, but not actually sealing, the conveyance would be upheld in equity.

This was so adjudged by Chancellor Kent in *Wadsworth* v. *Wendall, 5 Johns. Ch. 224*. That was a conveyance of land.

The same principle was followed in *Inhabitants of Montville* v. *Houghton, 8 Conn. 543*. That was a suit in equity to supply a seal to a bond executed by a receiver of taxes with sureties, and the court supplied the seal even against the sureties.

In both of these cases, however, the instrument is declared to be executed by a seal but was not actually so done.

To the same effect is *Inhabitants of the Township of Bernards* v. *Stebbins, 109 U. S. 341*.

The more serious question, however, is whether the court will give the same force to the instrument as if it were sealed when there is no declaration of an intention to seal and no evidence that the omission was by accident or mistake.

Now we have seen that the intention of the husband in this case was perfectly clear, namely, to give to his wife the house and lot in question for a valuable consideration. The requisition by him of the payment of the one dollar is persuasive evidence on that point.

Further, I am of the opinion that it does not lie in the mouths of his heirs-at-law to assert that he was not sincere, but was indulging in the perpetration of a fraud upon his wife. She has been a faithful wife and his advanced age and failing health and strength rendered it important that she should continue to minister to his daily wants in these last days of his life.

The monied consideration of this contract failing, as it does, to be such as to warrant the favorable action of this court on that ground alone, the question remains whether the relation between the parties was such—husband and wife—as to raise what is known by jurists as a meritorious, as contradistinguished from a valuable, consideration.

This question has been thoroughly considered by the courts. I dealt with it in *Conover* v. *Brown, supra,* and sustained the gift of what purported to be a sealed bill, which, however, was not actually sealed, given by a father to his child. The decree advised by me in that case was reversed by the court of errors and appeals (*50 N. J. Eq.* (*5 Dick.*) *753*), but in so doing that court did not disturb the result I arrived at as to the validity of the sealed bill, but acted upon the line of authorities which had held in this state that there could be no set-off against a debt which was secured by a mortgage on lands bought under foreclosure, a doctrine having its origin in a palpable error (see *16 N. J. L. J.* (*1893*) (at *p. 358*), but persisted in by our courts until finally changed by statute. *P. L. 1900 p. 310.*

This subject has also been dealt with by the English chancellors in dealing with cases of the defective execution of powers and where the question arose as to in what cases those defects will be remedied. The principle has been recognized and sustained and never departed from that mere volunteers have no standing in equity to ask the court to supply a defective execution, and the question has in each case been one of the sufficiency of the consideration.

Sir Edward Sugden, in his work on *Powers* (*2 Sugd. Pow. 89 ch. 10*), states

"that the execution of a power and a surrender of a copyhold go hand in hand on precisely the same ground, and that consequently the same relief is to be granted in cases of defective execution of a power and of a grant of the surrender of a copyhold."

This was held by Sir Edward Sugden, as lord-chancellor of Ireland, in *Ellis* v. *Nimmo, Lloyd & G. t. P. 340.* This last, by the way, was a suit to enforce the specific performance of a promise *in futuro.*

In his book on *Powers* he enumerates (at *p. 93*) the classes of persons in whose favor equity will, in the absence of a valuable consideration, supply defects, as *first,* creditors; *second,* a wife and a legitimate child, for, continues the learned author,

"wives and children are in some degree considered as creditors by nature, and although, to constitute a valuable consideration for a settlement on a wife or child, it must be made before marriage, yet the marriage and blood are meritorious considerations, and claim the aid of a court of equity in support of a defective execution of a power in their favor, although the power was executed after marriage."

In the next section (commencing at *p. 114*) he speaks of the character of the reformation and says:

"and it is only necessary that the intention to execute the power should appear clearly in writing. Whether the donee of the power only covenant to execute it, or by his will desire the remainderman to create the estate, or merely enter into a contract, not under seal, to execute his power, or by letters promise to grant an estate which he can only do by an exercise of his power, equity will supply the defect."

It is hardly necessary to add that the learned author cites authority for each of these propositions.

Mr. Chance, in his treatise on *Powers* (*Chance Pow. ch. 23* § 1 ¶ *2819*), is equally explicit. He says: "The principle upon which relief proceeds appears to be that adopted by courts of equity, with reference to ordinary agreements and defective assurances." And (in ¶ *2835*) he declares: "A wife claiming by a voluntary disposition is clearly entitled to relief." By a voluntary disposition he means, of course, a disposition made after marriage, as contradistinguished to a disposition made before and in consideration of a marriage to take place, which latter has always been held to be a valuable consideration even as against creditors.

Before going into the ancient authorities I will refer to a case in our own state, cited by counsel, decided by Chancellor Haines.

*Satterthwaite* v. *Emly, 4 N. J. Eq. (3 Gr. Ch.) 489.* That was a contest between the wife, claiming under a well-executed post-nuptial settlement by her husband and his creditors. The wife, by her bill, attacked the priority of certain judgments which were recovered before the recording of the deed of settlement but after its execution. The learned chancellor says (at the bottom of *p. 490*) : "This case involves the interesting question of the validity of the post-nuptial settlement made in pursuance of a parol antenuptial agreement. And if such antenuptial agreement were fairly shown I should be inclined to give validity to the settlement in pursuance of it. But such settlement could not be said to be voluntary but upon a good and valuable consideration, to wit, the marriage and the conveyance of all the wife's estate." This case is relied upon by the complainant, but its only value here is in that it recognizes a certain value in a promise by parol by a husband before marriage to settle upon his wife, after marriage, her own property. The learned chancellor, however, could not have intended to say that marriage was a valuable consideration for a post-nuptial contract so as to validate it as against the husband's creditors.

Another modern case may be mentioned here, *Caton* v. *Caton, L. R. 1 Ch. App. 137 (1865).* That case was first heard by Vice-Chancellor Stuart, who delivered an elaborate opinion (*p. 140*), sustaining the widow's claim, but he was reversed, on appeal, by Lord-Chancellor Cranworth, sitting alone.

So far as the case settled any law in England, of course the law as declared by the lord-chancellor prevailed over that declared by Sir John Stuart, simply by reason of his holding the appellate position.

But in this country the weight of the authority depends entirely upon the soundness of the reasoning of the two judges, and I feel constrained to say that I prefer that of Sir John Stuart.

In that case the wife, before marriage, was possessed of a considerable personal estate—£14,000—and before marriage she and her husband agreed that the settlement of it should be made substantially upon the husband for life, with remainder to the wife with power to dispose of it by will during coverture. At the

last moment the husband persuaded the wife not to execute the settlement but to accept in lieu of it a will made by him, making the same disposition of the property. This will he actually executed in the presence of the wife and the marriage took place. Subsequently he made a different disposition by will of his property quite disadvantageous to the wife and died with the latter will in force. The wife claimed against this last will. Upon these facts and others tending to support her claim Sir John Stuart decreed in favor of the wife.

The case has little bearing on the present one except to show the disposition of judges to take into consideration pre-marriage promises void by virtue of the statute of frauds.

An early case is that of *Smith* v. *Ashton,* decided in 1675, and reported in *1 Ch. Cas. 263,* and again in *Freem. Ch.* (*Hov. ed.*) *308,* where the reasoning of the court is given with a citation of the authorities. Mr. Salkeld (*3 Salk. 277*) abstracts the case thus:

"The father, being seized of lands in fee, settled the same to the use of himself for life, remainder to his eldest son in tail, with a power to make leases, or by his last will, under hand *and seal,* to charge it with £500. Afterwards, by his will in writing, but *not sealed,* he charged it with £500 for his younger children, who, upon a bill exhibited against the heir, had a decree for the money, though it was objected that this settlement was wholly voluntary. But *per curiam* the power is well executed, for the substantial part of it is to do the thing, and the neglect of a circumstance shall not avoid it in a court of equity, and the rather, because such powers are not, like conditions, strictly to be expounded, but favorably to be construed for the benefit of the children."

In 1692, in the case of *Duchess of Albemarle* v. *Earl of Bath, Freem. Ch.* (*Hov. ed.*) *121,* it is stated: "But this court will oftentimes, in case of a purchaser or a creditor or for a provision for a younger child supply the want of livery or attornment or surrender in case of a devise of a copyhold."

In *Fothergill* v. *Fothergill, Freem. Ch.* (*Hov. ed.*) *256* (*1702*), which was a case of a suit by a widow to have her dower charged on certain lands, we find the following: "And it was held by the lord keeper and master of the rolls, that whenever a conveyance is made upon a good consideration, if there be any defect in the execution of it, that this court has always sup-

plied the defect; as in case of a feoffment, to supply the defect of livery, in devise of a copyhold, to supply the defect of a surrender; and much more in case of a power, as where any circumstances are omitted in the execution of it; and one reason given was, because the circumstances are imposed only that the party may not be surprised in the execution of it. And it was further held, that payment of debts, *provision for a wife* and children, marriages or purchases, were considerations for which this court had supplied such defects; and though provisions for wife and children after marriage are not *valuable* considerations, yet they are *good* considerations, and were always helped in this court; and therefore where a devise of a copyhold was made to a younger son without a surrender, he was always relieved against the heir-at-law; although it was objected that the heir-at-law is as nearly related as his brother, and having the law on his side, this court ought not to interpose; but the contrary hath always been held; and so the plaintiff here was relieved, the husband having covenanted that, in case these lands were not sufficient, it should be made up out of the other estates which he had a power of, although he was only tenant for life of them."

In 1728, in *Tollet* v. *Tollet, 2 P. Wms. 489* (by Cox), a provision for a wife under a power to make it by deed under his hand and seal was held to be good made under his will under his seal. In the same direction is *Cotter* v. *Layer, 2 P. Wms. 623,* decided by Lord-Chancellor Macclesfield in 1731. This chancellor was a great equity judge, though he was disgraced as a man for following the practice of his predecessor in selling the office of master.

The leading case, perhaps, is *Hervey* v. *Hervey,* decided by Lord Hardwicke, in 1739, and reported in *1 Atk. 561* (by Saunderson), and also in *Barn. Ch. 103,* as *Harvey* v. *Harvey.*

That was a suit by the widow of a tenant for life, who was his second wife, against his son by his first wife to enforce a settlement made upon her by her husband after the marriage. This settlement was attempted to be made by virtue of a power conferred upon his father, the husband of the complainant, by his son, the defendant, and contained in a family settlement or contract entered into between the father and son.

The father was tenant for life of valuable estates producing a large income of which the son was tenant in remainder in fee-simple; and the father, being desirous of marrying again and wishing to provide for his future wife, released his life estate to his son, reserving, among other things, the power to charge the estate with the provision for his future wife. He attempted to execute the power before the marriage, but that attempt was held by the lord-chancellor to be null and void, both in law and equity. After the marriage, being presumably advised of this defect, he attempted to re-execute the power in favor of his wife, and after his death this attempt to execute it was found to be of no effect at law because of a defect in its execution and the bill was filed to enforce it in equity.

This short statement of the case shows that it was in some respects similar to the present.

The cause was twice argued by distinguished counsel, and a great number of authorities cited, and Lord Hardwicke sustained it in equity.

Lord Hardwicke, in the course of his judgment, made several observations applicable here, thus (*1 Atk. 563*): "It has been rightly observed by the bar that a court of equity will supply a defective execution of a power as well in the case of younger children and a provision for a wife as in favor of purchasers or creditors." In support of this the reporter cites a long list of authorities.

Further on, after citing *Smith* v. *Ashton, supra,* and *Tollet* v. *Tollet, supra,* he says: "Upon these authorities, and many more which might be mentioned, there can be no doubt but if a tenant for life who has such a power does after marriage execute the power though defectively, yet it· shall be supplied." Here it is to be observed that the execution of a power over land amounts in equity to a conveyance of the land, and it is so stated by Barnardiston in his report. Then the lord-chancellor proceeded, and, holding that the attempt to execute this power before marriage was void, proceeds: "Then taking it upon this footing she must be considered as a wife unprovided for, and if so, she is clearly entitled to the relief of this court, according to the authorities before mentioned."

In the case before Lord Hardwicke, the husband, on his second marriage, had become possessed of a considerable sum of money belonging to his wife, and Lord Hardwicke said: "One reason that weighs greatly with me in the decree I am going to make is this: that if the wife had claimed the £600 per annum without setting forth any consideration but merely as a voluntary gift from her husband, there is no doubt but that this court would have given it to her."

Then, after hearing distinguished counsel, as before remarked, on a second argument, he adhered to his opinion previously delivered, and (at *p. 567*) he says: "In cases of aiding the defective execution of a power for a wife or child, whether the provision has been for a valuable consideration, has never entered into the view of the court; but being intended for a provision, whether voluntary or not, has always been held to invite this court to give aid to a wife or child, to carry it into execution, though defectively made." And (on *p. 568*) he says: "I am of the opinion that the rule as laid down by the defendant's counsel that a wife or child who come for the aid of this court to supply a defective execution of a power must be entirely unprovided for is not the rule of this court. I think the general rule that the husband or a father are the proper judges of what is the reasonable provision for a wife or child is a good and valuable rule." These principles are stated more at length by Mr. Barnardiston in his report both of the judgment on the first argument and the judgment on the second argument, and the quotation last above made from Atkyn's is fully reported at the bottom of *p. 112* and the top of *p. 113*.

The complainant also relies on the case of *Montacute* v. *Maxwell,* decided by Lord-Chancellor Parker in 1720, and reported in *1 P. Wms. 618,* and afterwards on an amended bill before the same judge in *1 Str. 236*. The bill as originally filed set out that the wife, the complainant, having a separate estate before her marriage, agreed with her husband, the defendant, that there should be a pre-nuptial contract, and the terms were agreed upon, but the writings not being perfected the defendant, her husband, coaxed her to waive the previous execution, "but engaged that upon his honor she should have the same advantage of the agree-

ment as if it were in writing, drawn in form by counsel and executed." Whereupon the marriage took place and afterwards, difficulties having arisen, the wife wrote a letter to the husband reminding him of his promise, to which he replied, stating that he was always willing that she should enjoy her fortune as if sole and that it should be at her command. The husband pleaded the statute of frauds and perjuries which was sustained by Lord-Chancellor Parker, who stated that, as to the letter, it contained only general expressions, as that the estate should be at the complainant's command, but added "had it recited or mentioned the former agreement and promised its performance, therefor it had been material." The complainant then amended her bill in which she set forth a letter wherein he promised to make a settlement and that he was ready to sign the writings according to her desire. To this the defendant answered that as to the letter he doth not remember the particulars, but if he has wrote anything concerning his readiness to sign any writing it only related to some proposals he had made of settling a sum of £1,500 on her and which he did soon after sign. To this he added a plea of the statute of frauds. To this the lord-chancellor declared: "The case is very much altered now from what it was at first. Then it stood purely on the parol promise before marriage, upon which there was no color to relieve the plaintiff. *But such parol promise on marriage is sufficient consideration to support a settlement made agreeable to it after marriage. This has been frequently determined. So it is also sufficient consideration to establish a promise made in writing after marriage.* Now here is great evidence of such a promise made in writing after marriage; he doth not deny his writing, that he was ready to execute the writings as she desired, but avoids it by saying they referred to proposals of settling £1,500, which is impossible, because it appears she never desired any such settlement. And though he says he has signed that settlement, it does not appear when he did it, and I am very jealous he did it since the amended bill." And the lord-chancellor overruled the plea of the statute of frauds but allowed the pleading to stand as an answer.

The result of that case is that the mere promise in a letter by a husband after marriage to make a settlement which he has

promised to make verbally before marriage was held to be binding upon him. The case goes farther than it is necessary to go here in order to sustain the complainant's claim, for there was a mere promise to do something *in futuro,* whereas in the present case there is an attempt to do something *in præsenti* in fulfillment of a promise made before marriage and as an inducement to marriage.

The circumstance that the defective conveyance was made in pursuance and fulfillment of a well-established pre-marriage parol promise differentiates this case from that class of cases cited and relied upon by counsel for the defendants where mortgages and conveyances made by elderly people in favor of a child or friend occupying a position of influence have been set aside, in which our courts have prescribed and followed severe but wholesome rules as to undue influence. The statute of frauds making parol promises, in consideration of marriage, void, is a severe one, and where, as here, the parol promise is thoroughly established, it works a manifest hardship. Hence, as the adjudged cases show, the courts are quite ready to sustain a post-nuptial written ratification of it.

But, as before observed, there is not the least evidence in this case of any undue influence. I was at the hearing, and am still entirely satisfied that the complainant's account of the transaction is entirely reliable. Her manner and the extent of her evidence give assurance of her truthfulness. At the date of the document she had served her husband as a faithful wife for over eight years without having reminded him of her claim, and then it was her husband who introduced the subject. Her objection to doing the errand for him was of the slightest, and she actually performed the service requested.

The paper was prepared by her husband in her absence.

He was eighty-four years old and undoubtedly beginning to fail, and probably realized it. He could not have expected to live long and his act was one of simple justice.

The evidence does not satisfy me that he had so far failed in his mind as to be incapable of a full understanding of the meaning, consequences and effect of the act. I am satisfied that he

knew and felt that it was simply doing his duty in fulfillment of his promise.

The chirography of the paper shows that he wrote with difficulty. But a comparison of it with his signatures to bank checks made for many years previously, and afterwards, shows that the difficulty was one he had felt for a long time and which increased gradually but steadily with advancing years. The proofs show that he wrote letters to his children after the date of this instrument, which indicate no mental failing, and he also drew and signed checks on his bank.

Upon this part of the case I am satisfied that he had the mental faculties of discernment and judgment quite sufficient in strength to execute this instrument.

But it is urged that the document was not finally delivered. I do not so conclude. I find that there was an actual, formal tradition of the document by the husband to the wife without any condition imposed nor any understanding, express or implied, that it was not to remain under her control at her free will and pleasure. This constitutes delivery. The handing back of the paper by the wife to the husband at his request did not, in my judgment, destroy or in anywise affect the delivery. It was natural for her to entrust its safekeeping to him, such as she did her other valuables, such as jewelry, &c.

It is a small piece of paper, and, though witnessed, was not acknowledged. But an intelligent business man like the complainant's husband must have known that that circumstance did not prevent its beneficial use by the wife. He knew that, by a parol contract and arrangement with her, she was receiving only $25 per month of the rent, and that there was no immediate occasion for its use by her. Nevertheless, I think it took effect in equity at once and was so intended. I do not think it was intended or must be viewed by the court as testamentary in its character.

Comment was made naturally and properly by counsel for the defendants upon the excessive portion which the establishment of this document as a conveyance will give the complainant. The deceased, when he made the promise before marriage and fulfilled it after marriage, was perfectly aware of the extent of the

right of the wife, as such, in his real estate and personal property in case of intestacy, and it must be presumed that his intention was to assure her a larger share than the law would give her. Further, it must be remembered that it was within his power, after the execution of this paper, to have made a will, cutting off her rights in his personal estate. He was fully aware of his duty to his children and was capable of judging of its force and weight. Under those circumstances it is not within the province of this court to review or severely criticise the judgment of the husband unless it is so glaringly wrong as to excite distrust of the soundness of his mind. On this subject I refer again to what was said by Lord Hardwicke in his second judgment in *Harvey* v. *Harvey, Barn. 119:* "In cases on this subject it has been rightly said by the court, that the husband or father are the proper judges whether the wife or child are sufficiently provided for or not. In these cases the court will not examine whether the provision that has been made was a suitable provision or not, but will leave it to the husband or father to judge when they shall be sufficiently provided for. And was the court to enter into an inquiry of that sort, the court must examine into such circumstances of families which it would not be fit for them to do; and therefore in these sort of cases the court has never entered into the question whether the wife or child was sufficiently provided for. If the father or husband has said that they were not sufficiently provided for, and has considered them as such, the court has considered them in the same manner."

For these reasons I conclude the complainant is entitled to relief.

The next question is as to the extent of the relief to which the complainant is entitled. The allegation in the charging part of the bill is that the paper writing did "notwithstanding any irregularities or infirmities therein convey to your oratrix an estate in fee-simple in the lands and premises," &c., and an argument was made that the lack of the word "heirs" would be supplied by this court in obedience to the clear intent of the testator and in accordance with a line of decided cases in this state. But in the prayer for relief is this clause,

"that they, the defendants, may be decreed to make, execute and deliver to your oratrix all necessary papers of whatsoever nature as may be necessary to perfect the title of your oratrix in and to the said premises, and to insure her enjoyment of the same *during the term of her natural life,*"

and then follows a prayer for general relief. This special prayer is a clear indication of what was in the mind of the draughtsman of the bill. He evidently felt a difficulty in asking the court to go beyond the single defect in the paper, viz., the lack of a seal. Moreover then and in argument both counsel seem to have overlooked the act of March 24th, 1899 (*P. L. 1899 p. 531*), giving validity, by its first section, to what has been termed "Chancellor Kent's Deed," and by its second section, as amended by the act of April 9th, 1902 (*P. L. 1902 p. 688*), providing that every such deed shall be construed to convey all the estate, right, title and interest, &c., of the grantor, and adding "and the word 'heirs' shall not be necessary in any such deed to effect a conveyance of the fee-simple."

It may be, and indeed is, highly probable that the complainant's husband was familiar with that very recent legislation, and had it in mind in preparing the paper in question, and if he had affixed a seal thereto, the only defect of the deed would have been that it was directly by husband to wife, and therefore not good at law.

I feel constrained to say that I believe the intention of the husband was to give an absolute title in fee-simple in the premises to his wife, and that the lack of the word "heirs" does not prevent that intention from taking effect.

But the wife has been obliged to come into this court for its aid, and it has been held in similar cases that the maxim, "he who asks equity must do equity," applies to this class of cases. And in this connection I feel further constrained to say that I am not satisfied that the husband intended or supposed that his wife should or would have her dower in the rest of his real estate as well as this one lot. He died possessed of three houses and lots. The one given to his wife is the more valuable of the three. Then he had some personal property, and his wife's share in that amounted to about $800. I think justice will be

done by imposing a term upon the complainant that if she accepts the title in fee-simple to the lot here in question she must release her dower in the other lots.

I will advise a decree according to these views.