JOHN H. LETTS, petitioner and respondent,

*v.*

MARY E. NEWBRAND LETTS, defendant and appellant.

[Submitted July 10th, 1911.   Decided March 4th, 1912.]

1. The testimony required to bar a petitioner's right to relief in a suit for divorce must attain that degree of proof which is required to establish a matrimonial offence and which would have entitled a defendant to affirmative relief, if it had been asked for.

2. A divorce should not be granted upon the uncorroborated testimony of an alleged paramour, unless he be credible and his testimony worthy of belief.

3. The rule of practice applicable to the testimony of a *particeps criminis* in criminal cases is equally applicable to suits for divorce.

4. Where the testimony of an alleged paramour requires corroboration, that corroboration should be of material facts tending to establish the main fact charged—the act of adultery.

5. A husband is a competent witness to give such corroborative testimony, but he being a vitally interested party, his testimony should be strictly scrutinized and accepted with great caution.

---

On appeal from a decree of the court of chancery advised by Vice-Chancellor Howell, whose opinion is reported *ante p. 513.*

*Messrs. Woodbridge & March,* for the appellant.

*Mr. William E. Florence,* for the petitioner.

The opinion of the court was delivered by

KALISCH, J.

This is an appeal from a decree of divorce *nisi,* wherein it was adjudged and decreed by the court of chancery upon a petition for divorce, filed by John H. Letts, the petitioner, that the appellant, Mary E. Newbrand Letts, on the 17th day of March, 1908, had committed adultery with one George Connett, the co-respondent named therein, at Sayresville, in this state; and that the cross-petition filed in the suit by the appellant praying for a divorce from bed and board for extreme cruelty be dismissed.

The parties were married on the 19th day of September, 1898, at South River, Middlesex county, in this state. At the time of the marriage the petitioner was twenty years of age and the appellant not quite eighteen. An engagement to marry existed between the parties for some time prior to its taking place. It appears from the testimony that pending the engagement to marry, and about six months before that event happened, the petitioner seduced the appellant, and that three months after their marriage a female child was born to them, the only issue of the pair. The petitioner admits that the appellant was *enceinte* by him when he married her, and he supplements it with the statement that he married her because he had to. Thus, at the very threshold of the petitioner's entering into the matrimonial state with the woman he had wronged and who was soon to become the mother of their child, a glimpse is obtained of his utter lack of moral sense and obligation, and of his state of mind and feeling toward the appellant. And the statement of the petitioner that he married the appellant because he had to becomes an intelligible key to the proceedings instituted by him against his wife.

From the testimony, it appears that immediately after their marriage the couple returned to Sayreville and lived with the wife's parents for nearly two years, when they went to housekeeping in Sayreville on their own account, and where they lived together as husband and wife until the 17th day of March, 1908; and they continued to live together after that date, under the

same roof, until the 30th day of March, 1908, when, according to the husband's story, his wife, of her own volition, although he was willing that she should remain, left her home. The wife denies this. Her story is, in substance, that her husband had treated her ever since their marriage in a cruel manner, oftentimes reviling and beating her, and that on the 30th day of March he told her to get out and threatened to inflict bodily injury upon her unless she went, and that he opened the door and said: "Now you get or I will hurt you," and that he told her to go home to her mother and stay there.

There is a strong probability of the truth of the appellant's version of what she suffered at the hands of her husband during her cohabitation with him, and that it was upon his order and threat of injury that she left her home, but it lacks that corroboration which the law requires upon which to base the affirmative relief prayed for in appellant's cross-petition; neither was it sufficient in law to constitute a bar to the petitioner's suit for divorce.

The testimony required to bar a petitioner's right to relief in a suit for divorce must reach that degree of proof which is required to establish a matrimonial offence which would have entitled a defendant to affirmative relief, if it had been asked for. To that degree of required proof the testimony, on the part of the appellant, failed to attain.

But there is an aspect of the case in which the testimony, just adverted to, becomes all important and influential, and that is, in so far as it sheds light upon the springs of the husband's conduct and in a measure supports the appellant's contention that there lurked in the petitioner's bosom ever since his forced marriage to the appellant, a settled and determined design to get rid of her.

The decree in favor of the husband against his wife is founded upon the testimony of an alleged paramour and whose testimony it is claimed has been corroborated by the husband. Vice-Chancellor Howell, in his opinion, says: "I have hesitated, and feel a hesitation now, about advising a decree for a divorce on the testimony of those two people," but the vice-chancellor thought there were matters of corroboration in two particular instances: one

in a letter termed the "Dear Danny" letter, and which was supposed to be addressed to a man named "Daniel Keegan," but which was unsigned and undelivered and which the husband claimed to have found December 12th, 1907, about three months before the alleged adultery, upon the top of a wardrobe, five feet in height, in the bedroom. The husband's story regarding the finding of the note is told by him with circumstantial particularity, and what seems remarkable is that he had an abiding faith that he would find such a note, although he discloses no circumstances which could have led him to this belief; and furthermore, by some occult power, he seemed to know just the place where the note was so that he was enabled to put his hand upon it as soon as he entered the bedroom. It also appeared that he never told his wife anything about his finding the note. But even if it be assumed that the wife wrote the note, which she most emphatically denied, it was never sent; it was not addressed to anybody in particular; it was not concealed, the husband had no difficulty in finding it; and further, Dan is not the man who is charged in the petition with having had adulterous intercourse with the appellant. And besides there was nothing in the contents of the note which in the slightest indicated that the appellant was of a depraved nature and lewdly inclined or from which it might have been inferred that she had the willingness and desire to commit adultery with Connett, the co-respondent.

It does not follow, because a letter, written by a woman, designed for a particular man, contains ardent expressions, that the inference should be drawn that she would be ready to fall into the arms of the first man who would present himself to her. The law requires an act more flagrant than that before a wife can be robbed of her reputation for chastity and virtue.

From the testimony in the case, it clearly appears that ever since her marriage the appellant has been a chaste, patient and suffering wife. There is not a spark of testimony to indicate that she has ever conducted herself improperly or immodestly, or that she ever was neglectful of her wifely duties, or that she ever kept company with any stranger, or that she was lewd or lascivious. The only other circumstance to which the vice-chancellor attached great weight as being corroborative that the appellant

committed adultery with Connett was the finding of ten or a dozen pictorial postal cards in the petitioner's house and which were brought there by the appellant's sister, a Mrs. Fox, who was a witness for the defence. Those postal cards the vice-chancellor found to be indecent. And from that fact the vice-chancellor concluded that it showed a condition of mind which is favorable to the commission of the crime which was charged against the appellant. The possession of the postal cards was equally consistent with curiosity and inquisitiveness, a desire to peep at forbidden things, without the remotest idea of doing anything wrong or immoral. The inference therefore drawn by the vice-chancellor from their possession by the appellant was not justified.

The decree of the court of chancery therefore must rest for its support upon the testimony of the alleged paramour and the petitioner.

A single act of adultery is charged against the wife. It is alleged to have been committed with George Connett in the petitioner's home, between eight and nine o'clock, on the evening of the 17th of March, 1908. Connett drove a grocery wagon and delivered orders. He delivered groceries at the petitioner's house almost daily for a period of thirteen months. He was eighteen and a half years old at the time his alleged adulterous intercourse with the appellant took place, and he tells with rather a boastful glee that at that time he had already much experience with women. And it is from the lips of this self-confessed youthful libertine that proceeds the confession, in court, that he had committed a single act of adultery with the appellant on the night stated and upon which the proof of adultery in this case rests. His story, in substance, is that "somewheres around" the 16th of March, 1908, the appellant told him, "My husband is going up to the blow-out of the O. U. A. M." "He won't be home that night, come up to the house." "I said, 'All right,' so I went." That he went to the house about half-past eight; that there were two children there, one ten and the other about thirteen years old. The witness referred to the daughter of Mrs. Letts, who was then ten years of age and an adopted child, a niece of Mr. Letts, thirteen years of age. That Mrs. Letts invited him into the parlor

where she told him to remain until she put the children to bed, and that she went out with the children; that he remained downstairs, that nothing was said between him and Mrs. Letts upon her return, and that they went into the middle room where there was a lounge and upon it he had connection with Mrs. Letts; that they were sitting on the lounge when there came a knock at the back door, whereupon he started to go out of the front door and Mr. Letts was there and then he states: "When I went back. in the kitchen I told her;" thereupon Mrs. Letts told him "Go in this door;" so he went the way he was directed, which led to the cellar, and that while he was down there Mrs. Letts got a pail of coal and went upstairs with it, and Mr. Letts came down and lit a light, took him by the collar up the stairs and asked him what he was doing in the house, to which he replied that he didn't know, and then Mr. Letts took him next door to the Sanderson's daughters and said, "I caught this fellow in my house," and that he, the witness, then said, "Hello, Emma;" "Hello, Celia," and that Letts then released him. Neither of the Misses Sanderson was called as a witness at the trial. Connett remained in Sayreville two days and then he says he ran away and went to New Brunswick, which is in the close neighborhood of Sayreville. The witness admitted that there had never been before this night any familiarity between Mrs. Letts and himself; that he had never called upon her before; that Mrs. Letts never made any advances to him nor he to her at any time, and that it was at his suggestion that she went with him upon the lounge. And, according to Connett's story, the act was committed, as it appears, without previously any words or acts of familiarity passing between them, without a word of love or passion spoken, and without the least token of affection or caress given.

The story told by Connett is so contrary to the natural order of things and so contrary to the natural operation and manifestations of the human passions and feelings upon such an occasion, in which Connett claims to have been an actor, that it may be regarded as a highly improbable one. To entitle it to belief it should receive convincing corroboration.

I doubt if there can be found in the history of the divorce court anywhere such a *rara avis,* a male co-respondent, who had volun-

tarily come forward in aid of an injured husband suing for a di-
vorce; who had sunk his manhood, his morals and his honor so
low as to go voluntarily upon the witness stand and with brazen
impunity proclaimed his triumph over his victim, to irretrievably
disgrace and ruin her. The experience of mankind has been to
the contrary, and, therefore, when a case arises which is contrary
to this experience, it is such an aberration from the normal trend
of human action that it requires convincing proof to confirm it.

Connett's story is contradicted in some of its essential features.
It is evident that he desired to make it appear that when he ar-
rived at Letts's house that evening the two girls were there and
that Mrs. Letts desired to get them out of the way by putting
them to bed. Both girls testified that they did not see Connett
on that night, which contradicts Connett's story that Mrs. Letts
put them to bed when he came in, whereas the testimony of Mrs.
Letts is to the effect that the girls had been put to bed before
Connett came. Connett admitted that he told Louis Zach that he
never had anything to do with Mrs. Letts. Several witnesses for
the defence testified that Connett told them that he never had
anything to do with Mrs. Letts. Connett says that he left the
middle room to go to the front door and found Letts there and
went back into the kitchen and told Mrs. Letts. This statement
is important since it confirms Mrs. Letts in her statement that
she was ironing in the kitchen when her husband came and had
been there during the entire evening.

Mrs. Letts denied most emphatically the charge made against
her. She admits that Connett was in the kitchen when Letts
came there, and not in the cellar, and accounts for Connett's
presence by his coming to the house stating that he was sent to
get Mr. Letts to come to the school election, which was being held
that evening. Now, it appears that Letts was at the school elec-
tion that evening. Mrs. Letts says that Connett had been in the
kitchen not more than five minutes, where she was standing iron-
ing some clothes, before Letts came, and that she let him in by
the kitchen door which was locked, and that as soon as he entered
he seized Connett, who was sitting in the kitchen, and threw him
out of the door.

Mrs. Letts denies the story told by Connett in every particular,

and stoutly maintained that Connett was admitted to the kitchen and there remained until Letts came and put him out. The only corroboration of Connett's story that he was concealed in the cellar comes from Mr. Letts. Letts's description of his own conduct after he found the door locked and saw the disordered condition of his wife and suspected that there was a man concealed in the house gives rise to grave suspicion as to the truth of his story. He says, he suspected the man was concealed in the cellar and yet he refrained from following his wife to the cellar when she went there with a scuttle for coal, believing, as he says he did at the time, that "she went down to place him some way or another." Is this consistent with the natural conduct of an injured husband whose home was invaded by an adulterer fresh from his conquest and who was being sheltered by the wife of his bosom, under the roof which he had dishonored? Not only did the husband refrain from following his wife so that he might seize the destroyer of his domestic peace and happiness, but, according to his own narrative, he went upstairs to hang up his clothes and where he remained about five minutes, then leisurely proceeded to the cellar where he found Connett, seized him by the collar, and from that point the husband relates the same story as told by Connett. Why Connett should have remained in the cellar for five minutes when he could have easily escaped is not attempted to be explained. Why the injured husband withdrew himself for a time sufficiently long enough to have afforded the intruder time to get away has not been explained.

Mrs. Letts denies the story told by Connett as to any previously-arranged appointment with her. It also appeared in the case that Mr. Letts had said on one occasion that he would pay anybody $5 who would catch his wife with a man. He had expressed on several occasions a desire to get rid of his wife. All this is evidently a consistent outcome of the forced marriage into which Letts says he entered with Mrs. Letts, and it seems that the husband has, in a narrow view, treasured it up as a wrong. There is also testimony in the case that Connett told one Zach, a witness for the defence, that he had been sent by someone to Mrs. Letts's house which accounted for his presence there that night. While there is no testimony from which it may be inferred with any

degree of certainty that there was any collusion between the husband and Connett that Connett should be where he was found, yet it is quite manifest that there was a determined desire on the part of the husband to get rid of his wife, and as he is the corroborating witness relied on to support Connett's testimony, it is not only weak because it is the testimony of a husband seeking to sunder the marriage relation, but it is absolutely unworthy of credence, coming, as it does, from a husband who was discontented from the very outset of his marriage relation with the appellant and who was seeking for a cause to sever it. His conduct and his testimony leave the decided impression that he was willing and ready to connive at his wife's dishonor rather than to shield and protect her from wrong doing.

The vice-chancellor seemed to be of the opinion that if Connett was at the petitioner's home by an arrangement with the husband, that the husband would have undoubtedly taken with him disinterested persons to be used as witnesses and since he did not do so, it convinced him that the event was not the result of connivance between the husband and Connett, but a genuine surprise to him.

But, on the other hand, it is equally, if not more probable, that the husband would not take witnesses with him unless he had anticipated to catch his wife *flagrante delicto*.

It would not have furthered the scheme of the husband to have witnesses find his wife and Connett in the kitchen, she pursuing her domestic duties and he sitting on a chair as she testified, but an unscrupulous husband would rather depend upon a story told by himself which would tend to corroborate that of his confederate.

The burden of proof was clearly not sustained by the husband. The wife absolutely denied the charge. In support of the truth of her denial she testified that before and at the time of the alleged adultery, she had been and was suffering from an ailment affecting her genital organs which made the act of coition extremely painful to her. In this she was corroborated by a reputable physician and no attempt was made by the husband to contradict it. If such a physical condition existed, as testified to by Mrs. Letts and the physician who examined her, it most effectu-

ally subverted the conclusion drawn by the vice-chancellor that she was likely to have committed the alleged act. And it is a circumstance which positively shakes Connett's story that he had sexual intercourse with her and that she seemed to enjoy it.

There seems to be no conclusive reason why a decree for divorce may not be granted upon the uncorroborated testimony of a paramour, provided he is a credible witness and his story worthy of belief.

There appears to be no valid reason why a different rule of law should exist governing the testimony of a paramour in a divorce case than the one relating to the testimony of a *particeps criminis* in a criminal prosecution.

Mr. Justice Knapp, in *State* v. *Hyer, 39 N. J. Law (10 Vr.) 602,* in discussing this class of testimony, says: "There has grown up in the courts a settled practice quite universal and entitled to its observance almost to the reverence of law, to advise jurors, in the strongest cautionary terms, not to convict defendants on such testimony, unless they can find corroboration in the testimony of other and unsuspected witnesses, upon such material circumstances as tend directly to establish the guilt of the accused."

And for this rule of precaution the learned judge, on page 601, gives the following basis: "It was reasonable that courts should regard their testimony with suspicion, and look carefully into the secret motives that might actuate bad minds to draw in and victimize the innocent."

The learned judge, after citing numerous cases, reaches the conclusion that a valid conviction may be founded upon the uncorroborated testimony of an accomplice.

An exposition of the true rule of law, with the rule of practice engrafted upon it, as generally adopted by the courts governing the testimony of a *particeps criminis,* in suits for divorce, is tersely stated in *14 Cyc. 697,* as follows:

"While the testimony of the alleged paramour may be considered in determining the fact of the adultery, it is liable to grave suspicion and should be acted upon with extreme caution; and, ordinarily, unless it is corroborated, it is not sufficient to establish guilt."

The learned vice-chancellor, in this case, discharging the functions of both judge and jury, seemed to have overlooked the precautionary rule applicable to Connett's testimony, by accepting it as credible and worthy of belief, with which conclusion we cannot agree for the reasons already fully stated. Even though the husband was a competent witness, he was not, as appears from the testimony in the cause, a credible one. Even if he had been a credible witness his testimony falls short of corroborating Connett as to the material facts tending to prove the commission of the act of adultery charged against Mrs. Letts. That part of the decree of the court of chancery dismissing the defendant's cross-petition is affirmed, and that part of the decree adjudging that the defendant committed adultery with George Connett is reversed, and the record will be remitted, with directions to enter a decree dismissing the petition of the husband and affirming the decree denying the prayer of the wife's cross-petition.

*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, VOORHEES, MINTURN, KALISCH, BOGERT, VREDENBURGH, CONGDON, WHITE—13.