This bill seeks the recovery from the defendant of a diamond ring which came into defendant's possession on the death of her husband, and to which she claims title by virtue of her husband's will. The complainant claims the ring as her own property by virtue of a gift from her mother, now deceased, and seeks the aid of this court on the ground that the ring has a peculiar sentimental value by reason of its associations and because damages at law would be an inadequate remedy. This suit is in the nature of an equitable replevin. The evidence submitted at the final hearing showed that the complainant's father, Robert Bloomsburg, died at Bordentown, New Jersey, in 1899; that many years before his death he purchased an unset diamond for his wife, the mother of the complainant, and with the intention of having it set in a ring for her, and that at the time of the purchase the complainant accompanied her father. On their return home the complainant's father took the unset stone from his pocketbook and handed it to his wife, telling her it was for her and that she could have it set any way that she liked. Because she thought the stone was too large for her, however, she declined to have it set in a ring for herself, and after some months it was set in a ring for complainant's father, and he wore it until his death in 1899. While on his deathbed and in the presence of the complainant he handed the ring *Page 617 
to his wife and said: "This is the last gift, Jennie, I will ever give you. If you are hungry you can sell it for food; if not, it goes to Mary, then to Pud and then to the baby." "Mary" was a daughter of Robert Bloomsburg and "Pud" was the complainant, "Pud" being the father's pet name for her. The "baby" was the daughter of the complainant. These, together with a brother, George Bloomsburg, the husband of the defendant, comprised the family of Robert Bloomsburg. All of Robert Bloomsburg's family, with the exception of complainant, are now dead.
After the father's death, complainant's mother wore the ring until after the death of her daughter Mary, about three years later. She then gave the ring to complainant in George's presence. Complainant retained the ring until June 10th, 1909, when, at his request, she loaned it to her brother and took from him a receipt in his own handwriting, in the following form:
"In case of my death I promise to return my father's ring to his family. [Signed] George A. Bloomsburg, June 10, 1909."
Some time later in a letter written by George Bloomsburg to complainant, he said:
"About the paper regarding the ring, won't you kindly send it to me and I will make it all right with you in some other way. It would make things a great deal more pleasant for me if you will do this."
It seems that the defendant had started some family controversy about this ring and importuned her husband to get it from the complainant, which he finally did in an effort to appease the defendant. Complainant, however, refused to surrender the receipt.
When complainant's father died he left a will, of which he appointed his wife and his daughter Mary, executrices, and his son George, executor. The ring was inventoried as a part of the assets of the estate and appraised at $250. The estate was not formally settled through the courts, but, apparently, was adjusted out of court by agreement between *Page 618 
complainant and her brother long after the death of their mother and the complainant's sister.
Some time before June 10th, 1909, when the ring was delivered by complainant to her brother, the controversy then having arisen over its possession and ownership, he insisted that if she desired to retain the ring she would have to pay him $400, which she finally consented to do, and gave him her note for that amount. The note was finally paid on June 16th, 1910, by complainant's check, drawn to the order of George A. Bloomsburg for $416. It is significant that this payment was made over a year after the ring was delivered by complainant to her brother. If she did not own the ring at that time I cannot understand why she would have paid the note, as it is reasonable to suppose that upon a surrender of her claim to the ring the note would have been canceled.
George Bloomsburg retained possession of the ring until his death in 1925. He left a will dated December 15th, 1905, in which he devised all of his property to his wife, who is the defendant in this suit. A codicil to that will dated October 9th, 1914, contains the following paragraph:
"Whereas, since the making of my last will and testament to which this codicil is attached, I have executed a certain writing which might be considered a bequest of my diamond ring left me by my father, Robert Bloomsburg, I do hereby give and bequeath to my beloved wife, Mary A. Bloomsburg, the said diamond ring above referred to, absolutely for her benefit, behoof and use forever."
It is by virtue of this provision of the codicil that defendant claims title to the ring in question. The truth is, however, that the diamond ring had not been left to him by his father, and the statement in the codicil that it had been was a plain attempt to evade his obligation to return it to his sister.
Undoubtedly "this court has jurisdiction to enforce the restitution or delivery of a specific chattel which has a peculiar artificial value and for which, therefore, adequate compensation cannot be obtained at law, and that, too, whether possession has been got by the wrong-doer through a trust or not." Pattison v. Skillman, 34 N.J. Eq. 344. The same principle was involved in the later cases of Schrafft v.Wolters, 61 *Page 619 N.J. Eq. 467; Bindseil v. Smith, 61 N.J. Eq. 645; Motley v.Darling, 86 N.J. Eq. 185. This jurisdiction has been exercised by the court of chancery since very early times.
The earliest leading case on the subject and perhaps the one most frequently cited, is Pusey v. Pusey (1684), 1 Vern.273. That case involved the possession of a horn anciently given to the Pusey family by the Danish King Canute, and which time out of mind had gone along with the plaintiff's estate. The horn bore this inscription: "Kyng Knowd geve Wyllyam Pewse this horne to hold, by thy lond." It was held the bill was maintainable for the recovery of the specific chattel. The next reported case pertinent to this inquiry, and to which my attention has been directed, is Duke of Somerset v. Cookson (1735), 3 P. Wms.389. It involved the possession of an old silver patera bearing a Greek inscription and dedication to Hercules, which had been dug up on the plaintiff's estate. It had come into defendant's possession, and the Duke brought a bill in equity to compel its delivery in specie undefaced. Defendant demurred on the ground that the remedy was at law, but the demurrer was overruled. InFells v. Read (1796), 3 Ves. 70, a suit was brought to recover a tobacco bos of a remarkable kind which had belonged to a club, and the lord-chancellor stated the reason of the equitable remedy as follows:
"The Pusey horn, the patera of the Duke of Somerset, were things of that sort of value that a jury might not give twopence beyond the weight. It was not to be cast to the estimation of people who had not those feelings. In all cases where the object of the suit is not liable to a compensation by damages, it would be strange, if the law of this country did not afford any remedy. It would be great injustice, if an individual cannot have his property without being liable to the estimate of people who have not his feelings upon it."
In the later case of Nutbrown v. Thornton, 10 Ves. 163, Lord Eldon, speaking of the Pusey Horn Case, said:
"It turned upon the pretium affectionis, independent of the circumstance as to tenure, which could not be estimated in damages." *Page 620 
Numerous English and American cases involving this principle of equitable jurisprudence will be found cited in the note toPattison v. Skillman, supra, and in the note to section 12, pages 33 et seq., of Pom. Spec. Perf. (3d ed.). A well-considered American case involving this principle isMcGowin v. Remington, 12 Pa. St. 56; 51 Am. Dec. 584
(1849). The opinion in that case contains a learned discussion of the doctrine and its reasons. Justice Bell, speaking for the supreme court of Pennsylvania, said:
"Such articles as these are commonly esteemed not altogether, or perhaps at all, for their intrinsic value, but as being objects of attachment or curiosity, and therefore not to be measured in damages by a jury who cannot enter into the feelings of the owner; so, too, the impossibility, or even great difficulty of supplying their loss, may put damages out of the question as a medium of redress. But these are not the exclusive reasons why chancery interferes, for there may be cases where the thing sought to be recovered is susceptible of reproduction or substitution, and yet when damages could not be so estimated as to cover present loss or compensate its future consequent inconvenience. And I take it this is always so where, from the nature of the subject-matter, or the immediate object of the parties, no convenient measure of damages can be ascertained; or, where nothing could answer the justice of the case but the performance of the contract in specie." * * * "But there is another ground upon which this procedure may be sustained. InFells v. Read, the snuff bos was deposited with the defendant as a member of the society, upon certain terms, to be redelivered upon the happening of certain events. Lord Rosslyn held that under these facts the defendant was a depositary on an express trust which, upon a common ground of equity, gave the plaintiff title to sue in that court; and in this he was supported by Lord Eldon in the subsequent case of Nutbrown v. Thornton. It is then the case of a direct confidence violated; * * * a spell sufficiently potent to call into vigorous activity the authority invoked."
 In Pom. Spec. Perf, supra, the rule is expressed as follows: *Page 621 
"It is well settled that where chattels have some special peculiar value to their owner over and above any market value which could be placed upon them in accordance with strict legal rules, an interest which has happily been termed pretiumaffectionis, such as an heirloom; * * * contracts concerning them will be specifically enforced in equity, and a delivery of them will be decreed, although they might be recovered in the common-law actions of detinue or replevin. The reasons of this rule are the utter inadequacy of any mere pecuniary compensation, and the incompleteness of the relief afforded by the legal actions in which the defendant might easily evade an actual delivery of the chattel itself. * * * the equitable jurisdiction has not been confined to contracts; it is freely exercised to enforce the surrender and delivery of chattels in specie which have been tortiously obtained, or are wrongfully detained; * * *. Equity, however, will not interfere to specifically enforce a contract concerning even such a special and unique chattel, or to compel its delivery, when its pecuniary value has already been fixed by the parties or can be readily ascertained, so that an adequate compensation in the form of debt or damages can be recovered in a legal action."
In Lining v. Geddes (S.C.), 1 McCord Ch. 304;16 Am.Dec. 606, after referring to the old English cases of the Pusey horn, the silver altar piece, the silver tobacco box, the carved cherry stone, and others, the court said:
"These are cases which have their foundation in the refinement of society, and those affections of the heart which it would be a reproach to the country not to indulge. But still, they depend on the plain tangible principle that there is no adequate remedy at law, and the principle must not be extended to cases founded in weakness and folly."
Judge Story, in his work on 1 Eq. Jur. (11th ed.) 757 §709, says:
"But there are cases of personal goods and chattels, in which the remedy at law by damages would be utterly inadequate, and leave the injured party in a state of irremedial loss. In all such cases courts of equity will interfere, and grant full relief, by requiring a specific delivery of the thing which is wrongfully withheld.
"This may occur, where the thing is of a peculiar value and importance; and the loss of it cannot be fully compensated in damages, when withheld from the owner; and then relief will be granted in equity. * * * [The same rule has been applied to a `box of jewels,' to `mortgage deeds,' to `slaves,' to `furniture and household effects,' to `bank shares.'] The same principle applies to any other chattel, whose principal value consists in its antiquity; or its being the production of some distinguished artist; or in its being a family *Page 622 
relic, ornament, or heir-loom; such, for instance, as ancient gems, medals, and coins; ancient statutes and busts; paintings of old and distinguished masters; and even those of a modern date, having a peculiar distinction and value, such as family pictures and portraits, and ornaments, and other things of a kindred nature."
In 25 R.C.L. 294 § 104, the rule is stated as follows:
"Specific performance will be decreed and a contract enforced in regard to personal property which has a sentimental or peculiar and unique value over and above its pecuniary or intrinsic value."
And in 36 Cyc. 557:
"A chattel may have a special value to the owner because of his sentimental interest in it, a pretium affectionis."
In 5 Am. Eng. Ann. Cas. 270, will be found a note citing many cases dealing with this subject. It is there said:
"Where articles of personal property or peculiar and individual in character, or having an especial value on account of associations connected with them — such as pictures, annuities, heir-looms, family relics — or from some other cause, and are not measurable by a money standard, specific performance is generally decreed as the only adequate remedy the case is susceptible of."
Instances there cited where relief has been granted include personal property such as antiques, pieces of silver, box containing jewels, two China vases, deeds to real estate, the Pusey horn, papers of great value to establish heirship, valuable pictures, family pictures, picture painted by complainant, plans, plots, drafts of surveys, and surveyor's instruments belonging to surveyor, silver tobacco box, paintings, jewels and household furniture as heir-looms. After referring to the above cases the note proceeds:
"In most of the cases just cited specific performance was decreed on the ground that the chattels possessed a pretiumaffectionis."
A very early American case involving this principle isWilliams v. Howard (1819), 3 Murph. (7 N.C.) 80. That was a suit to recover possession of a particular slave "endeared *Page 623 
by a long course of service or early association" and relief was granted, the court saying, "for there is no standard by which the price of affection can be adjusted and no scale to graduate the feelings of the heart."
Objection on behalf of the defendant is made that there is a variance between the allegations of the bill and the proof — that the bill is based upon the claim that the ring is an heir-loom, while the proof shows it is not. The defendant contends for a strict application of the term "heir-loom." The pertinent paragraph of the bill in this connection reads as follows:
"The complainant further shows that said ring has considerable intrinsic value, but because of its associations and the fact that it belonged to complainant's father, endows it with an untold value as a heir-loom, the loss of which cannot be compensated by a money judgment."
But, irrespective of any variance between the allegations of the bill and the proof, if the facts show a right on the part of the complainant to relief, this court will award such relief as is appropriate and the bill may, if necessary, be amended to meet the proof. The facts proved at the hearing were, apparently, all within the knowledge of the defendant, and any claim of surprise cannot be sustained.
It is also objected that this is a suit for specific performance of an agreement by defendant's husband to return the ring to his father's family, and that, therefore, the executrix of her husband's will (who is the defendant herself) should have been made a party as such executrix. But while the equitable principles here involved are usually treated under the head of "specific performance" in works on equity jurisprudence, the jurisdiction of this court is not confined to that head; "it is freely exercised to enforce the surrender of chattels in specie
which have been tortiously obtained or are wrongfullydetained." (Italics mine.) Pom., supra.
But here, suit is not brought to enforce a written agreement. It is rather to enforce the right of the complainant to the return of the ring by reason of her ownership, amply proven, and the written instrument, the receipt signed by the *Page 624 
defendant's husband, is merely evidential of that ownership and an admission against interest. The right parties are in court; namely, the owner of the chattel, as complainant, and the person, the defendant, who wrongfully detains the chattel from its rightful owner.
It is further urged on behalf of the defendant that notwithstanding the executrix of George Bloomsburg is not, as such, made a party defendant, she, as devisee under his will, stands in a representative capacity and that therefore, under section 4 of the Evidence act, no evidence of any transaction by the decedent is admissible and the case of Kleb v. Kleb,70 N.J. Eq. 315, is cited in support of this contention. All of the testimony respecting transactions with the decedent was admitted over the objection of defendant's counsel. But, as pointed out by Vice-Chancellor Pitney in Cowdrey v. Cowdrey, 71 N.J. Eq. 353,
the remarks of Vice-Chancellor Stevens in the Kleb Case
were mere dicta and contrary to Vice-Chancellor Emery's previous decision in McKinley v. Coe, 66 N.J. Eq. 70, and contrary to Hodge v. Coriell, 44 N.J. Law 456, approved by the court of errors and appeals in Smith v. Smith,52 N.J. Law 207. See, also, Palmateer v. Tilton, 40 N.J. Eq. 555;Crimmins v. Crimmins, 43 N.J. Eq. 86; Vreeland v. Vreeland,53 N.J. Eq. 386; Wyckoff v. Norton, 60 N.J. Eq. 474.
Under these decisions it is plain that where devisees are sued as owners of land upon which, or in relation to which equitable rights are claimed, evidence of transactions with the decedent are admissible. In Hodge v. Coriell, supra, which was a replevin suit at law against one who set up a right as executor, such evidence was held admissible. If admissible at law, certainly it should be in equity. In the McKinley Case
Vice-Chancellor Emery said that the court of errors and appeals had held that the test of representative capacity was "whether one party or the other appeared on the record as a representative of the decedent." (Italics mine). In the HodgeCase, Chief-Justice Beasley said that the statute (the Evidence act) should be construed "according to the plain meaning of plain terms." There is no doubt in my mind *Page 625 
that the evidence objected to in the instant case was properly admitted.
The defendant also urges that there is no proof here that the complainant comes under the designation of "his family," and that the only person who would have a right to lay claim to the ring for the family would be an administrator de bonis non. I cannot agree with this latter contention. "His family" meant the persons who constituted it on the happening of the event specified; that is, upon the death of George Bloomsburg. The proof is clear that the only remaining member of "his family" is the complainant. If she has no rights as "his family," then no one has; but aside from this she is suing in her own right and the proof is plenary, in fact, uncontradicted, that she is the absolute owner of the ring in question by gift, and also by enforced purchase. It makes no difference, therefore, whether complainant does or does not come within the designation of "his family." The receipt was merely additional evidence of complainant's rights as owner, which, by other undisputed evidence are shown to have long antedated that paper.
Possession of the ring by George Bloomsburg and his widow for a period of seventeen years is urged as evidence of ownership in the defendant, but while possession is prima facie evidence of ownership (Nelson v. Bock, 84 N.J. Law 123), it is not conclusive. Such evidence is more than outweighted by that submitted on behalf of the complainant, which it is important to bear in mind, stands unchallenged and uncontradicted, the defendant having offered no proof whatever.
It is also argued by defendant that the complainant has an adequate remedy at law and that there is no evidence to show that this ring has any "special character or unique feature" which would render money damages in a suit at law inadequate. But, as was said by Justice Bell in McGowin v. Remington, supra:
"The thing to be guarded against is not the invasion of the defendant's rights, for he stands here absolutely without any, except the common interest every citizen had in preserving the proper line of distinction that divides the jurisdiction *Page 626 
and limits of the several courts. What is to be avoided is an unnecessary trespass upon the province of the common law tribunals, and this is to be tested by the simple query whether they offer a full remedy for the wrong complained of."
It is also insisted that mere sentiment or personal desire for a particular object affords no basis for an equitable action such as this. That may be true as an abstract proposition, but when that sentiment or desire is based upon or borne of facts and circumstances which endow the chattel with a special, aside from its intrinsic, value, to the extent of a pretium affectionis, it is not true. In such cases there is and can be no measure of damages in money. While this ring itself, as a piece of jewelry, may have a definite value in dollars and cents, how can the sentiment, the imaginary value put upon it by complainant's fancy, because of her affection for the one from whom she obtained it, be valued in terms of money any more than could a value be placed upon the "touch of a vanished hand" or "the sound of a voice that is still?" The real question here is whether or not this ring has a "pretium affectionis." If it has, whether because of sentiment, desire or what not, provided it be real, "not founded in weakness and folly" (Lining v. Geddes, supra) and not assumed for the occasion, then this court has jurisdiction, and relief should not be denied.
"Pretium affectionis" is defined in Wharton's Law Dictionary as "the imaginary value put upon a thing by the fancy of the owner in his affection for it." In Bouvier's Law Dictionary, it is defined as "an imaginary value put upon a thing by the fancy of the owner in his affection for it or for the person from whomhe obtained it." (Italics mine.) See, also, 22 Am. Eng.Encycl. L. 1292 and 31 Cyc. 1170.
There is here an abundance of proof to establish a "pretiumaffectionis" in this ring. The stone had been bought by complainant's father for her mother; it was later set in a ring which he wore during the balance of his lifetime and which, on his deathbed, and in complainant's presence, he gave to her mother with the injunction not to part with it except that *Page 627 
she be hungry and it was needed for bread, and that after her death it was to go first to the daughter Mary, then to complainant and eventually to complainant's daughter.
That it does have a real and not a pretended sentimental value is evidenced by the fact that the complainant cherished it from then until now; that she refused to sell it even to her own brother; that rather than be deprived of it she acquiesced in her brother's demands for the payment of a considerable sum of money to him on the pretense that it was property of the father's estate, when, in fact, it was her very own; that after the loan of the ring to her brother, ostensibly to prevent domestic discord, she refused to surrender the receipt which he had given for it and finally instituted this suit to recover the ring itself rather than its money value.
These facts show conclusively to my mind that the ring has had the pretium affectionis impressed upon it. To the defendant, it is merely a piece of jewelry, necessary to the gratification of envy or avarice; but to the complainant it recalls the day dreams of youth and the childhood memories of maturer years. It is endowed with a sentimental fancy, which even though imaginary, can no more be estimated in dollars and cents than can mother love or the guileless and trusting affection of the child. "There is no standard by which the price of affection can be adjusted and no scale to graduate the feelings of the heart." Williams
v. Howard, supra. To agree with defendant's argument would be to admit that sentiment should be commercialized; but when sentiment and the finer feelings of the heart are measured in terms of money, then will this world cease to be a fit habitation for man. "It would be a reproach to the country not to indulge" the complainant in her desire.
If necessary, it would not be difficult to spell out a trust here, the performance of which would be incumbent upon the defendant. In analogy to Fells v. Read, supra, it might very well be said here that the ring was deposited with the defendant's husband as a member of the family upon an express trust to return it to the remaining members of the *Page 628 
family upon the happening of a certain event, viz., his death. That the defendant had notice of the trust upon which the ring was received cannot be doubted, because in the codicil to the will under which she claims the ring, the receipt or instrument imposing the trust is referred to with sufficient clarity and definiteness to put the defendant upon notice of its contents. The reference was probably made in the belief that the trust could be thus terminated and the testator relieved of his obligation to his sister. When the defendant took the ring, therefore, it was with notice of complainant's rights.
It is also contended by defendant that the value of this ring has already been fixed by the complainant herself, first, by assenting to the appraisement in the inventory, and second, by the payment of some $400 to her brother for it. In the note to section 12, Pom. Spec. Perf. 37, referring to such a situation, it is said:
"The proposition of the text practically amounts to this, that a party may by his own acts put a certain value upon a unique chattel, which can be recovered at law, and which, by his own estimate, will be taken as a sufficient compensation."
That is undoubtedly true, and the question is whether or not in this instance the complainant herself has fixed a value on the ring. In my judgment she has not. The value appearing in the inventory was not her valuation, but the valuation of strangers, the appraisers. It is claimed that she assented to it and that this binds her; but, as already indicated, this estate was not formally settled through the courts, but was adjusted by the parties themselves out of court. I do not consider the complainant to have been bound by that appraisal. In fact, the appraisers had no right to include the ring in their inventory. It did not belong to the decedent, Robert Bloomsburg, as he had effectively disposed of it before his death.
As to the payment of some $400 to the brother, the surviving executor of her father's will, she did not fix this value. It was not a price set upon the article by her, it was a demand *Page 629 
of the defendant's husband, reluctantly complied with by the complainant under duress. It was, in effect, the price of peace, and I do not consider that by paying this price the complainant has in any way set a value on the chattel in controversy which could bind her or prejudice her in this action. The fact is, she was under no obligation in law or otherwise to pay a dollar. The property was already hers. The payment was no more than a gratuity or a peace offering.
For the reasons above expressed I will advise a decree for the complainant.