In several of its aspects this cause is an unfashionable one to be introduced to a court of equity for determination. Basically it pertains to the title and possession of a Plymouth automobile which, in the existing industrial conditions, is alleged to be a rare and unique article of personalty. Vide, however, Burr v.Bloomsburg, 101 N.J. Eq. 615; 138 Atl. Rep. 876. In retaining jurisdiction I have preferred to recognize the suit as one prosecuted to nullify a bill of sale alleged to have been procured fraudulently and without consideration.
The controversy recoils from the indiscretions of the parties. In its broad factual appearance, the indecorous acts of the complainant are manifestly surpassed by the dishonorable perfidy of the defendant. The story can be readily summarized. *Page 411 
The parties were employed at the establishment of a war industry, where their acquaintance and ensuing associations originated. Both were married persons, but in the initial period of their companionship neither thought it prudent or necessary to divulge that incidental fact to the other.
While the defendant is noticeably lacking in the physical comeliness of an Adonis, nevertheless the complainant's interest in him, like Aphrodite's, gradually ascended to an altitude of infatuation. When released from work, they frequently convened at a neighboring tavern, where they enjoyed, and she paid for, the refreshments. She bestowed upon him many gifts, such as a wrist watch, a wallet (he conserved his earnings), gloves, neckties, and sun glasses. Indeed, he smoothly persuaded her to loan him $200. Up to this point he rejoiced in playing the role of a subsidized escort. He subsequently permitted her to contemplate the dissolution of their former marriages and their future alliance in matrimony.
On December 14th, 1945, she purchased the automobile at the price of $1,000. She did not have a license to operate a motor vehicle, but the vendor had promised to instruct her. The defendant forthwith expressed to the complainant his ardent desire to visit his relatives in Pennsylvania, and he implored her to permit him to have the use of the car for the accomplishment of that journey but, according to the testimony of the complainant, he shrewdly informed her that if, perchance, the vehicle should be involved in some accident, she, by virtue of her ownership of it, might incur some personal pecuniary liability. He accordingly recommended that it would be entirely feasible and extremely precautions for her to transfer temporarily the apparent ownership of the vehicle to him. She did so on December 20th, 1945, where upon the defendant departed for Pennsylvania.
During his absence, his wife either fortuitously or designedly met the complainant. The interview inspired the complainant to make an unexpected personal visit at the address in Pennsylvania where the defendant had assured her he intended to sojourn. The defendant was not at that address. The complainant was informed that the defendant could be reached at a designated residence in a nearby village *Page 412 
in the company of one "Amelia." It may be inferred that Amelia was no more pleased to meet the complainant than the latter was pleased to meet Amelia.
The circumstances of that occasion caused the curtain of implicit faith to drop from the complainant's eyes, and she discovered that the pretended fidelity of the defendant was merely a deceptive shadow. "Now sighs steal out and tears begin to flow," said Pope.
The defendant returned to Middlesex County, New Jersey, early in January, 1946. The complainant immediately requested him to surrender the automobile and its title to her. He refused. She intimated her intention to consult an attorney. He threatened that should she do so, he would impart to her husband full knowledge of their associations. He then retired as a gigolo to become a cad. But let me continue.
Upon the institution of the present cause, the defendant filed an answer in which he averred that "the complainant meretriciously had sexual relations with this defendant on many occasions since the month of October, 1945," and that the complainant gave him the automobile "in consideration of the meretricious relation existing between the complainant and this defendant."
Furthermore, the defendant at the final hearing, and in the presence of the complainant's husband, related brazenly and without a blush of humility, his sexual performances with the complainant, and he sought to multiply the number of such occurrences as if he were endeavoring to establish an adequatequantum meruit. Thus again the defendant retrogrades; this time to the level of venality.
The words of Mr. Justice Kalisch, expressive of the sentiment of the Court of Errors and Appeals in Letts v. Letts, 79 N.J. Eq. 630,635; 82 Atl. Rep. 845, reverberate: "I doubt if there can be found in the history of the divorce court anywhere such arara avis, a male co-respondent, who had voluntarily come forward in aid of an injured husband suing for a divorce; who had sunk his manhood, his morals and his honor so low as to go voluntarily upon the witness stand and with brazen impunity proclaimed his triumph over his victim, to irretrievably disgrace and ruin her. The experience of *Page 413 
mankind has been to the contrary, and, therefore, when a case arises which is contrary to this experience, it is such an aberration from the normal trend of human action that it requires convincing proof to confirm it."
The complainant denied that her associations with the defendant had included any sexual indulgences. I can attribute some measure of credibility to her testimony, but I do not hesitate to declare that I cannot repose any credence whatever in that of the defendant. The defendant claims the automobile as a remunerative reward for his "meretricious" servitude. His counsel confronts the complainant with the maxim "He who comes into equity must come with clean hands." It is the defendant himself who has sought to soil and besmear the hands of the complainant. The maxim has its limitations. It does not banish all sinful suitors from a court of equity. The iniquitous conduct must be related proximately to the act of the defendant which is the subject matter of the cause of action; it must be evil practice or wrongful conduct in the particular transaction in respect to which the complainant seeks redress. Neubeck v. Neubeck,94 N.J. Eq. 167; 119 Atl. Rep. 26; 2 Pom. Eq. Jur. (5th ed.), §§397 et seq.
It must be realized that the doctrine of unclean hands has its logical justification only in considerations of good conscience and natural justice. There are cases in which a court of equity in fulfillment of the reasons and objects of its creation and existence may in furtherance of natural justice aid the one who comparatively is the more innocent. 3 Pom. Eq. Jur. (5thed.), § 942. The complainant's benevolence and the defendant's malevolence do not escape attention. In the posture of the proof in this case I shall not permit the defendant to profit from the feminine weaknesses of the complainant. The defendant acknowledges that he never contributed a penny to the purchase price of the automobile. When first interviewed by an attorney of the complainant, he suggested a compromise by which he might purchase the vehicle by means of installment payments. He has since chosen to darken some corner in which to hide his loot. Indeed, it required some coercion from the bench to induce *Page 414 
the defendant to disclose where he was concealing the automobile.
I am unable to accept the doctrine of unclean hands as a positive defense to the complainant's cause of action. I have, however, paused to consider whether there was an absolute, unconditional, and unqualified gift under the rigid rules of the common law. I think not. Notwithstanding the unwholesome motives of the complainant, I conclude that she intended the transfer to be essentially a bailment. The transfer on her part was undoubtedly conditional and deceitfully procured by means of an imposition upon her enchantment.
Neither my judgment derived from an observation of the witnesses nor my conception of equity and natural justice permits me to absolve the defendant. The decisions of our courts are intended to be expressive or explanatory of the rules that are to govern the relations and conduct of individuals in our social organization. There must be an organic connection between the community sentiment and opinion upon such subjects as manhood, integrity, honor, and fairness, and the laws and decisions of our courts. It would seem to me to be a barbarian rule of human conduct that would enable this defendant to succeed in his deliberate brigandage and attempted extortion.
I shall advise a decree for the complainant. *Page 415