**CAMPBELL SOUP CO. v. WENTZ et al.**

**CAMPBELL SOUP CO. v. LOJESKI.**

Nos. 9648, 9649.

United States Court of Appeals
Third Circuit.

Argued Nov. 16, 1948.

Decided Dec. 23, 1948.

Rehearing Denied Jan. 14, 1949.

Charles A. Wolfe, of Philadelphia, Pa. (Sidney L. Wickenhaver and Montgomery, McCracken, Walker & Rhoads, all of Philadelphia Pa., on the brief), for appellant.

Richardson Dilworth, of Philadelphia, Pa. (David B. Zoob, William L. Matz, Zoob & Matz, Harold E. Kohn, James A. Sutton and Paxson, Kalish, Dilworth & Green all of Philadelphia, Pa., on the brief), for appellees.

Before BIGGS, Chief Judge, and GOODRICH and O'CONNELL, Circuit Judges.

GOODRICH, Circuit Judge.

These are appeals from judgments of the District Court denying equitable relief to the buyer under a contract for the sale of carrots. The defendants in No. 9648 are the contract sellers. The defendant in No. 9649 is the second purchaser of part of the carrots which are the subject matter of the contract.

The transactions which raise the issues may be briefly summarized. On June 21, 1947, Campbell Soup Company (Campbell), a New Jersey corporation, entered into a written contract with George B. Wentz and Harry T. Wentz, who are Pennsylvania farmers, for delivery by the Wentzes to Campbell of all the Chantenay red cored carrots to be grown on fifteen acres of the Wentz farm during the 1947 season. Where the contract was entered into does not appear. The contract provides, however, for delivery of the carrots at the Campbell plant in Camden, New Jersey. The prices specified in the contract ranged from $23 to $30 per ton according to the time of delivery. The contract price for January, 1948 was $30 a ton.

The Wentzes harvested approximately 100 tons of carrots from the fifteen acres covered by the contract. Early in January, 1948, they told a Campbell representative that they would not deliver their carrots at the contract price. The market price at that time was at least $90 per ton, and Chantenay red cored carrots were virtually unobtainable. The Wentzes then sold approximately 62 tons of their carrots to the defendant Lojeski, a neighboring farmer. Lojeski resold about 58 tons on the open market, approximately half to Campbell and the balance to other purchasers.

On January 9, 1948, Campbell, suspecting that Lojeski was selling it "contract carrots," refused to purchase any more, and instituted these suits against the Wentz brothers and Lojeski to enjoin further sale of the contract carrots to others, and to compel specific performance of the contract. The trial court denied equitable relief.[1] We agree with the result reached, but on a different ground from that relied upon by the District Court.

The case has been presented by both sides as though Erie Railroad v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, and Klaxon Company v. Stentor Electric Manufacturing Co., Inc., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, had never been decided. We are not advised as to the place of the contract, although as we have pointed out in other cases, the Pennsylvania conflict of laws rule, which binds us here, refers matters concerning the validity and extent of obligation of the contract to the place of making.[2] In this instance, however, the absence of data on which to base a rule of reference does not preclude the decision of the case. We have said several times in this Circuit that the question of the form of relief is a matter for

[1] The issue is preserved on appeal by an arrangement under which Campbell received all the carrots held by the Wentzes and Lojeski, paying a stipulated market price of $90 per ton, $30 to the defendants, and the balance into the registry of the District Court pending the outcome of these appeals.

[2] A. M. Webb & Co. v. Robert P. Miller Co., 3 Cir., 1946, 157 F.2d 865; Griffin v. Metal Products Co., 1919, 264 Pa. 254, 107 A. 713; Restatement, Conflict of Laws § 332 (1934). Cf. Texas Motorcoaches v. A. C. F. Motors Co., 3 Cir., 1946, 154 F.2d 91; Restatement, Conflict of Laws § 358 (1934).

a federal court to decide.[3] But neither federal decisions[4] nor the law of New Jersey or Pennsylvania as expressed in the Uniform Sales Act[5] differ upon this point. A party may have specific performance of a contract for the sale of chattels if the legal remedy is inadequate. Inadequacy of the legal remedy is necessarily a matter to be determined by an examination of the facts in each particular instance.

We think that on the question of adequacy of the legal remedy the case is one appropriate for specific performance. It was expressly found that at the time of the trial it was "virtually impossible to obtain Chantenay carrots in the open market." This Chantenay carrot is one which the plaintiff uses in large quantities, furnishing the seed to the growers with whom it makes contracts. It was not claimed that in nutritive value it is any better than other types of carrots. Its blunt shape makes it easier to handle in processing. And its color and texture differ from other varieties. The color is brighter than other carrots. The trial court found that the plaintiff failed to establish what proportion of its carrots is used for the production of soup stock and what proportion is used as identifiable physical ingredients in its soups. We do not think lack of proof on that point is material. It did appear that the plaintiff uses carrots in fifteen of its twenty-one soups. It also appeared that it uses these Chantenay carrots diced in some of them and that the appearance is uniform. The preservation of uniformity in appearance in a food article marketed throughout the country and sold under the manufacturer's name is a matter of considerable commercial significance and one which is properly considered in determining whether a substitute ingredient is just as good as the original.

■ The trial court concluded that the plaintiff had failed to establish that the carrots, "judged by objective standards," are unique goods. This we think is not a pure fact conclusion like a finding that Chantenay carrots are of uniform color. It is either a conclusion of law or of mixed fact and law and we are bound to exercise our independent judgment upon it. That the test for specific performance is not necessarily "objective" is shown by the many cases in which equity has given it to enforce contracts for articles—family heirlooms and the like—the value of which was personal to the plaintiff.[6]

■■ Judged by the general standards applicable to determining the adequacy of the legal remedy[7] we think that on this point the case is a proper one for equitable relief. There is considerable authority, old and new, showing liberality in the granting of an equitable remedy.[8] We see no reason why a court should be reluctant to grant specific relief when it can be given without supervision of the court or other time-consuming processes against one who has deliberately broken his agreement. Here the goods of the special type contracted for were unavailable on the open market, the

[3] Orth v. Transit Investment Corp., 3 Cir., 1942, 132 F.2d 938; Black & Yates v. Mahogany Assn., 3 Cir., 1941, 129 F.2d 227, 148 A.L.R. 841, certiorari denied, 1942, 317 U.S. 672, 63 S.Ct. 76, 87 L.Ed. 539. Cf. Note, 55 Yale L.J. 401 (1946).

[4] Gray v. Premier Investment Co., D.C. W.D.La., 1943, 51 F.Supp. 944; Texas Co. v. Central Fuel Oil Co., 8 Cir., 1912, 194 Fed. 1.

[5] Uniform Sales Act, § 68, N.J.S.A. 46:30-74; 69 P.S. § 313.

[6] Burr v. Bloomsburg, 1927, 101 N.J. Eq. 615, 138 A. 876; Sloane v. Clauss, 1901, 64 Ohio St. 125, 59 N.E. 884; 5 Williston, Contracts § 1419 n. 6 (Rev. ed. 1937).

[7] Restatement, Contracts § 361 (1932); 5 Williston, Contracts § 1419 (Rev. ed. 1937); 1 Pomeroy, Equity Jurisprudence § 221b (5th ed. 1941).

[8] Oreland Equipment Co. v. Copco Steel and Engineering Corp., 1944, 310 Mich. 6, 16 N.W.2d 646; Kann v. Wausau Abrasives Co., 1925, 81 N.H. 535, 129 A. 374; Mantell v. International Plastic Harmonica Corp., 1946, 138 N.J.Eq. 562, 49 A.2d 290; DeMoss v. Conart Motor Sales, Inc., Ohio Com.Pl., 1947, 72 N.E. 2d 158, noted in 26 Tex.L.Rev. 351 (1948); Cochrane v. Szpakowski, 1946, 355 Pa. 357, 49 A.2d 692; Note, 152 A.L. R. 4 (1944). Professor Williston has consistently advocated a more liberal use of equitable remedies, especially under the specific performance provision of the Uniform Sales Act. 3 Williston, Sales § 601 (Rev. ed. 1948); 5 Williston, Contracts § 1419 (Rev. ed. 1937).

plaintiff had contracted for them long ahead in anticipation of its needs, and had built up a general reputation for its products as part of which reputation uniform appearance was important. We think if this were all that was involved in the case specific performance should have been granted.

The reason that we shall affirm instead of reversing with an order for specific performance is found in the contract itself. We think it is too hard a bargain and too one-sided an agreement to entitle the plaintiff to relief in a court of conscience. For each individual grower the agreement is made by filling in names and quantity and price on a printed form furnished by the buyer. This form has quite obviously been drawn by skilful draftsmen with the buyer's interests in mind.

Paragraph 2 provides for the manner of delivery. Carrots are to have their stalks cut off and be in clean sanitary bags or other containers approved by Campbell. This paragraph concludes with a statement that Campbell's determination of conformance with specifications shall be conclusive.

■ The defendants attack this provision as unconscionable. We do not think that it is, standing by itself. We think that the provision is comparable to the promise to perform to the satisfaction of another [9] and that Campbell would be held liable if it refused carrots which did in fact conform to the specifications.[10]

The next paragraph allows Campbell to refuse carrots in excess of twelve tons to the acre. The next contains a covenant by the grower that he will not sell carrots to anyone else except the carrots rejected by Campbell nor will he permit anyone else to grow carrots on his land. Paragraph 10 provides liquidated damages to the extent of $50 per acre for any breach by the grower. There is no provision for liquidated or any other damages for breach of contract by Campbell.

The provision of the contract which we think is the hardest is paragraph 9, set out in the margin.[11] It will be noted that Campbell is excused from accepting carrots under certain circumstances. But even under such circumstances the grower, while he cannot say Campbell is liable for failure to take the carrots, is not permitted to sell them elsewhere unless Campbell agrees. This is the kind of provision which the late Francis H. Bohlen would call "carrying a good joke too far." What the grower may do with his product under the circumstances set out is not clear. He has covenanted not to store it anywhere except on his own farm and also not to sell to anybody else.

■ We are not suggesting that the contract is illegal. Nor are we suggesting any excuse for the grower in this case who has deliberately broken an agreement entered into with Campbell. We do think, however, that a party who has offered and succeeded in getting an agreement as tough as this one is, should not come to a chancellor and ask court help in the enforcement of its terms. That equity does not enforce unconscionable bargains is too well established to require elaborate citation.[12]

[9] Restatement, Contracts § 265 (1932); 3 Williston, Contracts § 675A (Rev. ed. 1937).

[10] Griffin Mfg. Co. v. Boom Boiler & Welding Co., 6 Cir., 1937, 90 F.2d 209, certiorari denied 1937, 302 U.S. 741, 58 S.Ct. 143, 82 L.Ed. 573; Lord Co. v. Industrial Dying & Finishing Works, 1916, 252 Pa. 421, 97 A. 573; 3 Williston, Contracts § 675A, n. 11 (Rev. ed. 1937).

[11] "Grower shall not be obligated to deliver any Carrots which he is unable to harvest or deliver, nor shall Campbell be obligated to receive or pay for any Carrots which it is unable to inspect, grade, receive, handle, use or pack at or ship in processed form from its plants in Camden (1) because of any circumstance beyond the control of Grower or Campbell, as the case may be, or (2) because of any labor disturbance, work stoppage, slow-down, or strike involving any of Campbell's employees. Campbell shall not be liable for any delay in receiving Carrots due to any of the above contingencies. During periods when Campbell is unable to receive Grower's Carrots, Grower may with Campbell's written consent, dispose of his Carrots elsewhere. Grower may not, however, sell or otherwise dispose of any Carrots which he is unable to deliver to Campbell."

[12] 4 Pomeroy, Equity Jurisprudence § 1405a (5th ed. 1941); 5 Williston, Contracts § 1425 (Rev. ed. 1937).

The plaintiff argues that the provisions of the contract are separable. We agree that they are, but do not think that decisions separating out certain provisions from illegal contracts are in point here. As already said, we do not suggest that this contract is illegal. All we say is that the sum total of its provisions drives too hard a bargain for a court of conscience to assist.

This disposition of the problem makes unnecessary further discussion of the separate liability of Lojeski, who was not a party to the contract, but who purchased some of the carrots from the Wentzes.

The judgments will be affirmed.