GRACE SEWELL, APPELLEE, v. WARREN SEWELL, APPELLANT.

69 N. W. 2d 549

Filed April 8, 1955. No. 33688.

*Hutton & Hutton,* for appellant.

*Deutsch & Jewell,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

This is an action for a divorce. Appellee alleged that the parties were married December 5, 1946; that they had since been residents of Madison County; that there was no issue of the marriage; that appellee had performed her marital obligations and had been a faithful and loyal wife; that appellant had without cause failed to support her; that he had struck, beat, and abused appellee, and had requested her to seek a divorce from him; that appellee had property of the value of $8,000 at the time of the marriage; that it was sold for that

amount and the proceeds, except $300, were used for her support since the marriage; that appellant had property and funds of the net value of about $25,000; and that appellee was without means for support or to defray expenses of the suit.

Appellant denied the wrongs charged against him by appellee and in a cross-petition asserted that he had been a faithful and considerate husband; that he had not given appellee cause for her conduct of publicly and falsely accusing appellant of nonsupport and extreme cruelty, and of leaving the family home on numerous occasions with the motive of injuring the reputation of appellant, humiliating, and embarrassing him; and that appellee committed adultery during the marriage of the parties, specifically in the month of November 1953, with a named male person, on January 5, 1954, between 2 a. m. and 2:45 a. m. with a man whose name was not known to appellant, and January 14, 1954, at about 1:30 a. m. with a person whose name was unknown.

The trial of the case resulted in findings for appellant and against appellee on the petition; for her and against appellant on his cross-petition; that the petition and cross-petition should each be dismissed; and that appellant should forthwith pay the temporary allowances previously made in the case and the costs thereof. A judgment was rendered in harmony with the findings. That adjudication is the cause of this appeal.

The ages of appellant and appellee at the time of the trial were 49 and 47 respectively. Their first attempt to marry was June 7, 1944, at Reno, Nevada. They lived together as husband and wife thereafter at Norfolk until October 1946. Appellee had been previously married and divorced, and appellant had been twice married and divorced from his second wife only about 2 months before the attempted marriage of the parties at Reno, Nevada. Appellee sometime thereafter learned the fact that appellant was a married man, that their attempted marriage was void, and she desired another

marriage ceremony performed. Appellant refused her request. This disagreement resulted, as appellee testified, in appellant in October 1946, striking, choking, and beating her. She left the place where they were living in Norfolk and moved to a hotel. The parties were separated until December 4, 1946. They became reconciled, went to Kansas, and were married December 5, 1946. They lived together thereafter as husband and wife, except during at least 4 other separations resulting from unpleasant marital experiences, until September 10, 1953. Their residence was at all these times in Norfolk. Appellee said that in 1948 appellant came home intoxicated, threw her out of bed on her head, and because thereof and other abuses inflicted upon her by him, she separated from him, went to Omaha, and instituted a suit for divorce. During the more than 4 years from June 7, 1944, to October 1948, appellee said appellant struck and injured her about every 2 weeks. She claimed that about the time she recovered from one black eye appellant would strike her and she would have another. Appellant went to Omaha, saw and talked with his wife, promised to treat her properly, they became reconciled, the divorce case was dismissed, and they returned to Norfolk about October 1948. Appellee testified that thereafter appellant on various occasions severely struck, beat, and injured her; that he choked her; that he struck her so that her eyes became black; and that on one occasion he struck her on the side of her head and injured her ear so that she could not hear with it for a considerable time. She gave the places and times of many of these occurrences. She said that appellant assaulted and kicked her out of bed on the nights of September 8 and 9, 1953. Appellee testified at length and quite in detail to the matters she claimed demonstrated the truth of her charge of nonsupport. They separated September 10, 1953, and this case was commenced on that date.

Appellee owned and operated a bar and a tavern in

Norfolk. A former employee of appellee testified that she was a bar maid therein in 1945 and until the sale of the bar and tavern in March 1946; that appellant and appellee lived in the second story of the building in which the bar and tavern were conducted in the first or ground story; that at different times when she came to work she observed that appellee had black eyes and bruises on her body; that the bruises were black and blue marks and appeared like somebody had hit her; that appellant frequently came into the place of business of appellee, created scenes, and applied vulgar epithets to his wife; and that on one occasion appellee and her husband had an argument, appellant grabbed appellee by one of her arms, and dragged her into the kitchen of the tavern.

A brother of appellee was a witness and he said that the day after Christmas in 1952 at his apartment in Omaha, he saw appellant strike appellee for no reason other than she wanted to stay in Omaha and do some shopping, and appellant wanted to go back to Norfolk; that the witness restrained appellant and insisted that he desist; and that the witness had seen appellee with black eyes and injuries to other portions of her body. He saw his sister quite frequently and almost each time she would have some bruises on her body. The last time he saw her in this condition was in the year 1953.

The corroboration of the testimony of the appellee was the evidence of the former employee, that of the brother of appellee, inferences claimed to be deducible from the incomplete records of the appellant produced at the trial, and a claimed presumption arising from his failure to produce his records as required and demanded by appellee. Appellant denied in detail all the testimony of his wife concerning his conduct in reference to her, except he admitted that he did once in 1946 strike her. He gave no explanation, justification, or reason for his act. The corroboration of the evidence of

the appellee is tenuous. Recognition of this is reasonably implicit in the comment of appellee that "Admittedly, the corroboration of the evidence on extreme cruelty was not too strong and the court considered it insufficient * * *." A decree of divorce may not be granted on the uncorroborated declarations, confessions, or admissions of the parties to the case. A general rule by which to measure the exact amount or degree of corroboration required cannot be formulated and each case must be decided upon its facts and circumstances. Peterson v. Peterson, 153 Neb. 727, 46 N. W. 2d 126; Spray v. Spray, 156 Neb. 774, 57 N. W. 2d 926; Roberts v. Roberts, 157 Neb. 163, 59 N. W. 2d 175. The matters offered by appellee as corroboration were not under the circumstances of this case sufficient.

The parties to this case voluntarily lived in an apartment in Norfolk for about 3 years preceding their separation September 10, 1953. They lived as man and wife, occupied a common bed, and had intimate relations during that time and until their separation. Appellee performed the household duties the morning of the day of the separation. She made breakfast for herself and her husband and prepared a lunch for appellant who was not intending to return at midday. She took care of the clothes of appellant and prepared an evening meal for him before she left the apartment. The parties have been in this contest since and have had no contacts or relations. An obstacle to the success of the case of appellee is condonation by her as a result of the foregoing recited facts of any and all breaches of marital duties by appellant to the time of their separation on the day of the institution of this case. Condonation is forgiveness for the past upon the condition that the wrong will not be repeated. Condonation is complete if there is a resumption of marital relations after the breach of marital duty. It is true that condonation is not asserted as a defense in this case, but the absence of a plea of condonation does not bar its consideration and applica-

tion by the court if the proof affords a proper basis for it. Wright v. Wright, 153 Neb. 18, 43 N. W. 2d 424; Hodges v. Hodges, 154 Neb. 178, 47 N. W. 2d 361; Pestel v. Pestel, 158 Neb. 611, 64 N. W. 2d 299, on rehearing, 159 Neb. 56, 65 N. W. 2d 233.

Appellant relies on charges of adultery by his wife to support his application for a divorce from her. A pick-up truck driver for Omaha Cold Storage Company was a witness for appellant. The truck driver said that November 18, 1953, he left Norfolk very early in the morning for a trip to Dimock, South Dakota, for a load of turkeys at a Mennonite Colony; that he had seen appellee a few times before; and that she was north of her apartment on North Third Street in Norfolk about 2:30 a. m. when he picked her up for the truck trip to South Dakota to get turkeys. The witness did not know where she was while the turkeys were loaded at the colony. They left there on the return trip about 10 a. m. and reached Norfolk about 2 p. m. that day. A Mennonite from the colony rode in the truck on the return trip. When they were a few miles north of Norfolk they passed appellant in a car and appellee "ducked down" in the seat to avoid being seen. Appellee left the truck when they got to the cold storage plant. The witness did not claim there was any improper conduct or relations on the trip. He said he had met appellee a few times at Shady Inn, a tavern out some distance from Norfolk; that he was running around with her in November 1953; that she bought him drinks; that she always had money; and that he had intimate relations with her twice during "the first several weeks of November * * *." He could not tell the place or places of these claimed indulgences "right offhand." Later he said "I imagine north part of Norfolk; north of Norfolk," but not necessarily "Along the roadside." He could not give the date of either of these events. He was not sure where he met appellee on either of these

occasions but he made the guess that he "Probably picked her up at Shady Inn."

The Mennonite who said he rode in the truck loaded with turkeys testified that the driver of the truck was accompanied by a woman; that she left the truck at the cold storage plant; and that the witness had never seen her before and did not see her again until at the trial of the case. He was not introduced to her and did not hear her name mentioned. He said appellant came to see him and told him he had to come down and identify the lady that was with them. He testified that the woman on the trip was the one who testified in the case as Mrs. Sewell.

Appellant testified that he was on the highway north of Norfolk accompanied by a lady friend of his November 18, 1953, and a poultry truck went by him and he saw appellee therein as she "ducked down." He said he saw her and the man who drove the truck at Shady Inn about 12:30 a. m. the night before; that he saw them November 24, 1953, at 2:30 a. m. enter the Perry Cafe; and November 29, 1953, they were together at the Legion Club. The wife of the truck driver was present at the trial and heard her husband testify. She was also a witness for appellant. She said she saw her husband, appellee, and another woman in the front seat of an automobile the last of November.

Appellee denied all the matters detailed in the foregoing. She said she went to Omaha to the home of her brother and his family the last part of October 1953, probably on the 29th day of that month; that she was there until November 30, 1953, and returned to Norfolk that night; that she went and stayed in Omaha because her brother was in poor health; and that she lived with her brother at 1954 Jones Street where he had a small apartment until November 25, 1953. She took a room at the Hotel Castle in Omaha that day because the apartment of her brother was small, his infant child had become ill, and they were crowded; and that she spent

Thanksgiving Day with her brother and family, and in fact prepared the Thanksgiving Day dinner. A statement of the Hotel Castle in Omaha is in evidence. It shows that appellee was there as a guest commencing with November 25, 1953, and each day thereafter through November 29, 1953. Her brother testified and specifically and definitely corroborated the testimony of appellee in all its details in this regard.

The truck driver in the presence of his wife related voluntarily, brazenly, and so far as the record indicates, without a blush of humility or emotional hesitation his alleged sexual performances with appellee. This was not done impulsively but deliberately. He proclaimed in his testimony that he intended to lie for appellee but upon further consideration "* * * I decided she had tramped around so much that it wasn't worth lying." He elected not to remain silent, as it had been carefully explained to him the law privileged him to do, but rather to do whatever further injury he could to the woman he claimed to have debauched and disgraced by relating the alleged facts which, if true, branded him as a criminal and publicly condemned his wife to the status of companion of a self-confessed adulterer. He thus retired as a gigolo and by self-appointment became a cad. Conduct not wholly dissimilar to this has been the subject of judicial comment. In Letts v. Letts, 79 N. J. Eq. 630, 82 A. 845, Ann. Cas. 1913A 1236, the writer of the opinion expressed the sentiment of the court in this language: "I doubt if there can be found in the history of the divorce court anywhere * * * a male co-respondent, who had voluntarily come forward in aid of an injured husband suing for a divorce; who had sunk his manhood, his morals and his honor so low as to go voluntarily upon the witness stand and with brazen impunity proclaimed his triumph over his victim, to irretrievably disgrace and ruin her. The experience of mankind has been to the contrary, and, therefore, when a case arises which is contrary to this experience, it is

such an aberration from the normal trend of human action that it requires convincing proof to confirm it."

The testimony of the truck driver that he had intimate relations with appellee was given voluntarily and was not corroborated. The witness was an alleged paramour. In 17 Am. Jur., Divorce and Separation, § 396, p. 343, it is said: "Though in an action for divorce on the ground of adultery the alleged paramour may testify that he has committed adultery with the defendant, his testimony should be received with caution. It should be given less weight when he testifies voluntarily than when he testifies under compulsion. All the cases recognize that the testimony of the paramour given voluntarily is entitled to but little credit." See, also, DeDonis v. De-Donis, 1 N. J. 43, 61 A. 2d 729; Annotation, Ann. Cas. 1913A 1240.

Appellant produced testimony tending to show that on the evening of January 4, 1954, appellee was in the company of Les Goodman at Shady Inn; that about 12:30 a. m., January 5, appellee was in his car near this tavern; that she and Les Goodman had a conversation and she drove away in his car; that at the request of Les Goodman appellant and his lady friend, who were at Shady Inn, went to the Perry Hotel in Norfolk in the car of appellant and had lunch there; that when Les Goodman left he was watched and he was seen to go into the apartment building where appellee was living; that this was about 2 a. m., January 5, 1954; and he stayed in the building about 45 minutes. Appellant made no effort to present Les Goodman as a witness.

The foregoing was denied by appellee in all its parts. She testified she moved to the south side of the apartment building on South Third Street Sunday, January 3, 1954. She left Norfolk January 4, 1954, on the 4 p. m. bus for Omaha. She said she was not in Norfolk on January 4 after the bus left for Omaha or on January 5, 1954. She on that date wrote a postcard in Omaha and mailed it there to Mrs. Helen Brueggeman. She

afterwards saw the card in the possession of the addressee when she returned to Norfolk. Appellee denied that Les Goodman was ever in any place occupied by her or that she had ever had any contact or association with him. Mrs. Helen Brueggeman testified she lived in a house back of the apartment building in which appellee lived. She helped appellee move in there on the Sunday following the first of the year 1954 which was the Friday preceding. She remembered the place was being redecorated and it was finished so that appellee could move in on Sunday instead of the following Monday. The witness said she helped appellee pack her baggage and she carried it out to the cab for appellee the next day, January 4, 1954, and that appellee left in the cab to take the 4 p. m. bus from Norfolk to Omaha. The witness received a card from appellee on January 6, 1954, that was postmarked at Omaha the preceding day. Appellee was not to the knowledge of the witness in her apartment on the night of January 4 or any time January 5, 1954.

Appellant testified that January 14, 1954, he saw appellee in a reclining position in the front seat of a Chevrolet automobile near the Shady Inn. The lights of his car were turned on the Chevrolet. The Chevrolet car was driven away and out to the highway. The witness followed it about 10 miles when it entered a side road on the west side of U. S. Highway No. 81, stopped, and the lights of the car were turned off. The witness left his car and went to the Chevrolet. He said he found appellee and a man sitting in the car in a loving embrace. The man was named by appellant as Bob Pruden. Appellant produced no supporting evidence of this alleged escapade.

Appellee denied the testimony concerning her being in the company of the man named as Bob Pruden. She said she had no acquaintance with or knowledge of such a person, and that she did not have any experiences

such as appellant described concerning her and some man.

Appellant in his original pleading in the case alleged as a ground of divorce that his wife on numerous occasions left the family home in anger without cause and falsely accused him of nonsupport and extreme cruelty for the purpose only of injuring his reputation, and humiliating and embarrassing him. In his amended pleading made about 5 months later he added the charges of adultery by his wife between the hours of 2 a. m. and 2:45 a. m., January 5, 1954, with a man whose name was not known to him, and January 14, 1954, at about 1:30 a. m., with some person whose name was unknown. This he verified by his oath. He testified at the trial that the man his wife improperly associated with in the early hours of January 5, 1954, was Les Goodman; that appellant had that night befriended Les Goodman; and that he, his lady friend, and Les Goodman had eaten lunch together at the Perry Hotel about an hour and a half before appellant claims Les Goodman had committed adultery with the wife of appellant. He testified that he and his lady friend had followed Les Goodman and had seen him go to the apartment of his wife about 2 a. m. and that they and the sister of the appellant had seen him leave about 45 minutes later. Likewise appellant in his pleading alleged and gave his oath that he did not know the man who immorally and criminally associated with his wife about 1:30 a. m., on January 14, 1954. He testified at the trial he saw and talked with the man guilty of the misconduct complained of at the place of the act, and the man was to his personal knowledge Bob Pruden. If his testimony in this regard at the trial was truth he was an eye witness on both occasions and knew the facts that he said in his amended pleading he did not know. It is inescapable that he misrepresented to the court on one or the other of the times he spoke in this case on the subject.

Mrs. Gladys McKay was employed at the cafe at the

Livestock Sales Barn in Norfolk from April to October 1951. Appellant was dealing in livestock. He ate meals at the cafe. Mrs. Gladys McKay said she was introduced to appellant in October 1953. About that time they were at the Colony Club in Norfolk. She did not ask him if he was a married man but she soon learned the fact because he solicited her to help him trail his wife. She accepted. He then asked her to go with him to bars, dances, and other places because he did not want to go alone. She accepted this invitation also. She said that they were together from then on every night and sometimes through the day. The record by other proof shows this to be remarkably true. Appellant testified that she was a great help to him in this case. The record attests that she was a willing and persistent though not necessarily a disinterested helper. Her devotion and efforts were such as to suggest that she considered her reward was more immediate than only a prospective contingency. She was with appellant the day he said a truck passed him and he saw his wife attempting to conceal her presence while riding in a truck loaded with turkeys. She was present and claimed to have witnessed all that appellant related concerning Les Goodman and appellee. She was asked if she was appellant's date that night and her answer was that she was not, that she got home at 3:15 a. m. The references in the record are numerous of frequent and habitual visits of appellant and his lady friend at the taverns, including Shady Inn out on the highway, and like night spots in and around Norfolk. Invariably the record proclaims where appellant was there his helpful companion was also. The fact that she was his constant and agreeable companion may furnish the reason appellant promptly and willingly granted Les Goodman the accommodation he requested of transportation from Shady Inn to the city of Norfolk immediately after appellee, as appellant testified, drove away from Shady Inn in the car of Les Goodman, and he had addressed appellee by an endearing

term in the presence of appellant; likewise it may explain the lunch of appellant and his companion with Les Goodman soon after they had returned to Norfolk from Shady Inn, and the reason appellant exhibited no resentment or remorse but on the contrary appellant evidenced delight when he learned, as he claims, of the unfaithfulness of his wife by her association and relations with the most brazen of her alleged paramours.

The testimony is irreconcilably conflicting. Appellant disputed in much detail substantially all the testimony of appellee and she reciprocated with respect to the testimony of appellant. The additional evidence is not less inharmonious. The evidence was substantially oral. The district court observed and heard the witnesses. It was in a favored situation to consider and estimate the merit or lack of merit of the conflicting claims of the parties. Hence the rule in this class of cases stated in Hodges v. Hodges, *supra:* "In an action for divorce if the evidence is principally oral and is in irreconcilable conflict, and the determination of the issues depends upon the reliability of the respective witnesses, the conclusion of the trial court as to such reliability will be carefully regarded by this court on review." See, also, Killip v. Killip, 156 Neb. 573, 57 N. W. 2d 147. The characteristics of this case make it appropriate to accord it the proper impact of this rule of practice. In James v. James, 29 Neb. 533, 45 N. W. 777, this court said: "The charge of adultery is a serious one, and it should be clearly established by competent testimony before a decree of divorce should be granted on that ground." This is a trial de novo on the record. It does not justify the granting of a divorce to the appellee or to the appellant.

An allowance for compensation to counsel for appellee for services performed by him in this court additional to the allowance made to him for services in the district court should be made. Pestel v. Pestel, *supra.*

The judgment of the district court should be and it is

affirmed. There should be and there is hereby awarded to counsel for appellee additional to the allowance made him in the district court the sum of $300 for services in this court on her behalf. The costs including the allowance of compensation to the counsel of appellee should be and they are taxed to appellant.

AFFIRMED.