FINE FASHIONS, INC., Appellant,

v.

Chris L. GROSS, District Director of Internal Revenue for the District of Camden, New Jersey, The United States of America and Penn Garment Company.

No. 13399.

United States Court of Appeals
Third Circuit.

Argued Jan. 27, 1961.

Decided June 1, 1961.

Rehearing Denied June 22, 1961.

Kalodner, Circuit Judge, dissented.

872

Benjamin Menschel, New York City (Wallstein, Menschel & Wallstein, New York City, on the brief), for appellant.

Michael I. Smith, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Robert N. Anderson, Attys., Dept. of Justice, Washington, D. C., Chester A. Weidenburner, U. S. Atty., Newark, N. J., John H. Mohrfeld, III, Asst. U. S. Atty., Camden, N. J., on the brief), for appellee.

Before BIGGS, Chief Judge, and McLAUGHLIN and KALODNER, Circuit Judges.

McLAUGHLIN, Circuit Judge.

On April 1, 1958 the Internal Revenue Service made a levy and distraint upon personal property in the possession of Penn Garment Company, a New Jersey corporation, at its plants, Penns Grove, New Jersey. The action was taken under Section 6321 of the Internal Revenue Code of 1954, 26 U.S.C. 1958 ed. Sec. 6321, to satisfy a lien in favor of the United States and against Penn for unpaid taxes. Appellant, claiming to be owner of the property, petitioned the court to nullify the seizure and turn the property over to it. The court, holding that Penn was the owner of the property, found its seizure justified.

Penn is a closed corporation owned and controlled by Louis Wolfe and his family. It manufactures women's apparel. On April 12, 1957, it obtained a contract with the Military Clothing and Textile Supply Agency, Philadelphia Quartermaster Depot, to supply 24,321 Air Force nurses' uniforms for a total price of $104,580.30. It sought to obtain the necessary cloth from Reeves Bros. Inc. textile manufacturers. Penn and Reeves agreed on quantity, quality and terms but Reeves would not deliver on Penn's credit alone.

Penn at the time was a contract manufacturer for Fine Fashions, Inc., a New York dress manufacturing corporation which had some garments made for it by independent contractors such as Penn. Fein, president of appellant, precisely gives the reason for helping Penn in his testimony as follows:

"The Court: So in order to keep in good with Wolfe, and his availability as an independent contractor, you went into this arrangement?

"The Witness: That is correct, sir.

"The Court: Is that the sum and substance of it?

"The Witness: Yes sir."

The Stipulation of Facts states: "As an accommodation, *Petitioner informed* said Louis Wolfe of its willingness to purchase from Reeves the material, referred to herein as blue chambray cloth, required under the contract referred to in Paragraph 1 and to make the same available to Penn solely for the purpose of said contract." (Emphasis supplied). The trial court adopted that as its fifth Finding of Fact.

On July 1, 1957 Penn entered into a factoring agreement with Linde Factors Corp., 384 Fifth Avenue, New York 16, N. Y. whereby it assigned to the latter all moneys due or to become due it under the above Quartermaster contract. It covenanted to receive in trust any moneys advanced thereunder to be first applied to payments to claims of subcontractors, et als. arising out of the performance of the contract, etc.

On July 2, 1957 there was a conference at the office of Linde Factors. Mahler, treasurer of Linde was present. Stanley Wolfe was there for Penn and Henry Mayersohn, Esq., the attorney for Fine Fashions, was there for his client. During the conference a letter to Fine

Fashions from Linde and approved by Penn was given Mayersohn. That reads:

"We have been directed by Penn Garment Company to retain all moneys received under contract #DA–36–243–QM–(CTM)–33 in the sum of $104,580.30, and which has been assigned to us. The purpose of the foregoing is to accumulate funds for the payment of piece goods purchased from Reeves Bros., and *which purchase was guaranteed by you specifically for this contract.*

"Funds are to be released only to Penn Garment Company, upon written authorization of *your accountant* Maurice Seifert, C.P.A. until all of said purchase invoices have been paid." (Emphasis supplied).

Mr. Mayersohn had that letter in his files until after the seizure of the cloth when he turned it over to Mr. Menschel then representing Fine Fashions. Mr. Menschel asked him as a witness at the hearing below:

"*What purpose did you seek to accomplish by this letter or to have accomplished by it?*" (Emphasis supplied).

The answer was "To have Linde Factors hold all of the funds received by it pursuant to the contract with the government to be paid, *which money to be paid over to Fine Fashions.*" (Emphasis supplied).

Mayersohn said he was shown the assignment from Penn to Linde and that he knew about it " * * * before July 2nd and subsequent to July 2nd of 1957." Then came the following questions and answers:

"Q. And what did you do? A. I, in turn, relayed it to Fine Fashions, to Mr. Fein, and told him of the request made by Stanley Wolfe, and *told him that he could place an order for the piece goods, that I had the paper from Linde Factors* and it was *alright for him to place the order for the piece goods at any time he saw fit,* and to purchase it himself.

"Q. Was anything said as to the form in which this purchase was to be made? A. Yes, I told him to make the purchase himself.

"Q. By himself, you mean in his own company's name? A. In the name of Fine Fashions." (Emphasis supplied).

Fine Fashions bought the cloth from Reeves and had it sent to "Penn Garment Co., Penns Grove, N. J." There was no restriction of any kind in the contract between Reeves and Fine Fashions with respect to delivery by the former to Penn. The latter went to work on its uniforms project and started shipping them out when completed. The finished uniforms were paid for to Linde as delivered. Linde turned over $8,979.70 of the money received to Fine Fashions in accordance with its July 2, 1957 letter to that concern. The latter paid that sum over to Reeves on account of the price of the cloth. Linde also disbursed to Penn, $25,433.75 under the July 2nd letter. On May 7, 1958 and July 12, 1958 Fine Fashions completed its payments to Reeves representing the balance of the cost of the cloth. The levy and distraint by the Director of Internal Revenue upon Penn's personal property had taken place over a month before, on April 1, 1958. Included in the property seized was some cloth as delivered by Reeves, cut up cloth, completed and partially completed uniforms.

Appellant's contention is that it was the purchaser of the cloth from Reeves and occupied no other position regarding the cloth. In the course of this it attempts to completely repudiate the arrangement set out in the July 2, 1957 letter and all thought that it was acting as guarantor for the payment of Reeves' bill. The evidence, and practically all of it is from appellant, does not permit this. The above quoted testimony of appellant's attorney conclusively establishes that the letter satisfactorily detailed the terms under which appellant purchased the cloth for Penn. All moneys received by Penn under its Quartermaster contract were to be channeled

into the factor and by it disbursed to (1) Fine Fashions to reimburse it for what it paid Reeves; (2) Penn for its operating expenses, etc.; finally that Fine Fashions guaranteed Reeves would be paid for its cloth. The testimony of Fein, president of Fine Fashions, supports that of his attorney as to this:

"Q. Now, what was your intention at the time you made these piece goods available to the Penn Garment Company? A. Those *goods were to be made into uniforms.*

"Q. And then, what was done with them? A. And then they were shipped to the Quartermaster, and the Quartermaster would issue a receipt to Linde from what I understand, and *Linde would pay me for the goods that went into it.*

\* \* \* \* \* \*

"Q. *Well, isn't it a fact that you look directly to Linde for the payment of these piece goods?* A. *Yes.*" (Emphasis supplied.)

Once appellant's attorney was satisfied with the assignment of the contract payments from Penn to Linde and "had the paper from Linde Factors" (which was the letter of July 2nd to appellant from Linde) he told the president, Fein, "*that he could place an order for the piece goods, * * *.*" (Emphasis supplied).

Nowhere in the record is Mr. Mayersohn's authority to act for Fine Fashions impugned. It was as the result of Linde Factors and Penn carrying out to the letter the procedures directed by Mayersohn and of the latter so advising Fein that Fine Fashions bought the cloth from Reeves and had it sent to Penn. An ineffective effort is made to attack the letter on the ground that it states "The purpose of the foregoing is to accumulate funds for the payment of piece goods purchased from Reeves and which purchase was guaranteed by you specifically for this contract." The suggestion is that the letter is dated July 2, 1957 and that the cloth was not actually bought until later. Whatever might be said as to whether the first clause could refer to future goods, the transaction outlined in the letter was the protection Fine Fashions desired, obtained and specifically approved in this particular deal. The sort of argument advanced lacks not only substance but is hardly appropriate under the circumstances.

Appellant in its brief misstates the Stipulation of Facts when it asserts "Since under the stipulation of facts petitioner was to make the goods 'available to Penn *solely* for the purpose of said (Quartermaster) contract' (4a emphasis supplied), it is clear that Penn never had the control it would have had as owner." What the Stipulation of Facts really says is:

" * * * Petitioner (Fine Fashions) *informed* said Louis Wolfe of its willingness to purchase from Reeves the material * * * and to make the same available to Penn solely for the purpose of said contract." (Emphasis supplied). (See full quotation set out supra).

There is not one word from Penn agreeing to this or any other action by it than has been above mentioned.

Appellant urges that there is no question of credibility of witnesses raised. It directly affirms in its reply brief "Such matters as were subject to oral testimony are uncontroverted and uncontradicted." This is unquestionably correct as far as the evidence of Fein, the president, and Mayersohn, the attorney, heretofore quoted is concerned. That testimony though uncontroverted and uncontradicted *might not necessarily have been believed* but we cannot fault the district court for accepting it. It seems to us to have the *ring of truth.*

It follows therefore that appellant's position that "The only basis upon which title in Penn might be presumed is from its bare possession of the cloth." simply avoids the realities of the record in this particular case on appeal.

The district court found that "The true intent of the parties was that Fine

Fashions, Inc. would pledge its credit rating to guarantee payment for the cloth and that title would vest in Penn Garment Company." The record factually justifies that conclusion. We cannot say it is erroneous as a matter of law.

The judgment of the district court will be affirmed.

KALODNER, Circuit Judge (dissenting).

I would reverse the judgment of the District Court for the reason that its fact-findings that "The true intent of the parties was that Fine Fashions, Inc. would pledge its credit rating to guarantee payment for the cloth and that title would vest in Penn Garment Company", and "title to the cloth in question was always in Penn Garment Company" are clearly erroneous.

The marital relationship is not established by the circumstance of their engagement but by the covenant of marriage which binds the betrothed together in the holy state of matrimony.

Here the majority, as did the District Court, looks to the engagement and not to the marriage to ascertain the relationship between the plaintiff, Fine Fashions, Inc. ("Fine"), and the Penn Garment Company ("Penn") with respect to the ownership of the cloth seized by the Internal Revenue Service as Penn's property.

Specifically, the majority and the District Court premised their view that Penn is the owner of the seized cloth on the engagement of Fine on July 2, 1957 to "guarantee" payment for the cloth in the event of its purchase by Penn from Reeves Brothers, Inc. ("Reeves") in complete disregard of the undisputed facts that (1) the "guarantee" arrangement of July 2, 1957 never came to fruition

because Penn did not make any purchase from Reeves, and (2) Fine made a direct purchase of the cloth from Reeves on October 15, 1957—three and a half months after the "guarantee" arrangement of July 2, 1957—and later Fine paid Reeves for the merchandise.

The District Court in Par. 8 of its "Findings of Fact",[1] specifically found that Fine purchased the cloth here involved from Reeves on October 15, 1957 and that under the terms of the sale payment for the cloth was to be made by Fine to Reeves. This fact finding was supported by the bills of sale of the cloth which were in evidence.

It must be pointed out at this juncture that the District Court, in its Oral Opinion, rendered at the conclusion of the taking of testimony on January 12, 1960, indicated its view that as between Fine and Penn the former was the owner of the cloth.

In its Oral Opinion, the District Court, addressing counsel for Fine, said:

"* * * I think possibly your argument discloses the weakness to the court of your position, and that is this: that you are greatly imbued, as you have a right to be, *with the position between Fine and Penn. There is no doubt as to what the rights would have been between Fine and Penn, but we don't have that here.* Here we have the Government in the very sound position of a creditor. * * *" (Emphasis supplied).

In connection with the foregoing it is appropriate to note that in the final paragraph of its written "Conclusions of Law" the District Court stated:[2]

"It is further Ordered that as a part of these Findings of Fact and Conclusions of Law that the oral

1. Par. 8 of the District Court's "Findings of Fact" reads as follows:
"8. Thereafter on October 15, 1957, the Petitioner entered into two purchase contracts with Reeves Bros., Inc. for the purchase of the required cloth. Said contracts provided for the direct shipment of this cloth to the Penn Garment Company. The total cost of the goods shipped by Reeves Bros., Inc. to Penn Garment Company was $32,010.70, payment to be made by the Petitioners within 70 days after shipment."

2. The Opinion of the District Court is unreported.

Findings of Fact and Conclusions of Law expressed by the Court at the conclusion of argument on January 12, 1960, and filed herein with the transcript, shall be and become a part of these Findings of Fact and Conclusions of Law."

It is necessary at this point to sketch in broad outline these undisputed facts which eventuated in the instant litigation.

Fine is a dress manufacturer. In the course of its operation it farms out some of the steps in its manufacturing process to independent contractors. The Wolfe interests controlled some of these independent contractors. Penn, one of the Wolfe enterprises, was a manufacturer of women's apparel. In April, 1957 it obtained a government contract for nurses' uniforms and tried without success, because of its poor credit rating, to purchase the cloth necessary to make the uniforms from Reeves, a New York piece goods house. Wolfe made known Penn's plight to Fine which agreed, on July 2, 1957, as an accommodation to Penn, to "guarantee" payment of the cloth on Penn's purchase of it from Reeves. Earlier, on July 1, 1957, Penn had assigned proceeds of its government contract to Linde Factors Corporation ("Linde"), and arranged with Linde to disburse such proceeds only at the direction of Fine. The purpose of the assignment was to insure an accumulation of funds to pay Reeves for the cloth so that Fine would not suffer a loss by reason of its guarantee. The government was duly notified at the time of the assignment in accordance with the provisions of the Assignment of Claims Act of October 9, 1940, as amended.[3] Fine was also advised by Linde of the assignment by letter on July 2, 1957 and approved of the arrangement between Penn and Linde.

The Penn purchase-Fine guarantee arrangement was never carried out. Instead, on October 15, 1957, Fine made a direct purchase of the cloth from Reeves on its own credit—payment to be made by it to Reeves in 70 days. Reeves was directed to ship the cloth to Penn. All this appears in the bill of sale set forth in the record. Shipments of the cloth were made in various stages between October 25, 1957 and February 1958. Penn started to make deliveries of the nurses' uniforms to the government in January 1958 and payments with respect to them were made by the government to Linde in accordance with the assignment.

On April 1, 1958 the Internal Revenue Service for the District of Camden, New Jersey, made an assessment of some $40,000 for taxes against Penn, and, pursuant to Sections 6321, 6322 and 6323 of the Internal Revenue Code of 1954,[4] levied and distrained on Penn's assets. Included in the property distrained was 16,954 yards of the cloth here involved, 540 completed nurses' uniforms, and a quantity of cut-up cloth. By a Consent Order entered by the District Court on October 1, 1958 a number of the completed uniforms were delivered to the government and the sum of $1,809.50 received in payment was deposited in the Court's registry.[5]

At the time of the distraint Linde had only made available, out of the funds received from the government, $8,979.70, for payment of the cloth, via Fine, to Reeves. Fine later paid to Reeves, according to the District Court's Findings of Fact, a balance of $17,021.52 due on its purchase of the cloth. It may be noted parenthetically that Fine, in its brief, says it made an additional payment of $6,009.70.

On May 23, 1958 Fine filed a petition in the District Court to quash the government's distraint. Following hearings, the District Court, sitting without a jury, entered judgment for the District Director of Internal Revenue. This appeal followed.

3. 41 U.S.C.A. § 15.

4. 26 U.S.C. §§ 6321, 6322, 6323.

5. According to Paragraph No. 15 of the Stipulation of Facts a balance of $6,400

in the possession of Linde was also levied upon by the District Director of Internal Revenue Service, Manhattan District of New York.

Fine contends here, as it did below, that it is the legal owner of the cloth seized by the government and that the distraint was ineffectual as to it for that reason, and further urges "that assuming taxpayer [Penn] had title to the cloth" the assignment to Linde (1) made Penn a "trustee" of the cloth, and (2) made the cloth "unavailable for tax liens."

The majority directed its attention only to the contention that Fine is the legal owner of the cloth and concluded that the District Court had correctly held otherwise. It did not consider the other points presented by Fine.

At the outset of this dissent I addressed myself to the majority's holding in this respect. On the score of that holding there is this to be said before proceeding to discussion of the further points presented by Fine:

I disagree with the majority's view that what was agreed to by Fine, Penn and Linde in July 1957 with reference to a "guarantee" is dispositive of the issue of ownership of the cloth at the time of its seizure. It is what took place in October 1957 and not in July 1957 that is dispositive of the issue as to whether Fine was the owner of the cloth involved when it was seized. The District Court found, as earlier stated, that Fine "entered into two purchase contracts with Reeves Bros., Inc. for the purchase of the required cloth", and that "payment" for the cloth was to be made by Fine to Reeves.[6] It also found that "Payment for said cloth was made to Reeves Bros., Inc. by Fine Fashions, Inc." [7] (Emphasis supplied.) Having made these Findings the District Court then proceeded to hold in its "Conclusions of Law" (Par. 2) "The true intent of the parties was that Fine Fashions, Inc. would pledge its credit rating to guarantee payment for the cloth and that title would vest in Penn Garment Company." (Emphasis supplied.)

As the District Court stated this "Conclusion of Law", it is not a "Conclusion of Law" at all but a fact-finding and as such it is utterly inconsistent with the Findings of Fact (Par. 8) that Fine purchased the cloth and (Par. 10) that Fine paid for it. In neither of these two Findings is there any semblance of a "guarantee" nor is there basis in them for a factual finding that "the true intent * * * [was] that title would vest in Penn Garment Company."

The so-called "Conclusion of Law" is further impeached by the District Court's statement to Fine's counsel in its Oral Opinion, earlier quoted:

"* * * You are greatly imbued, as you have a right to be, with the position between Fine and Penn. *There is no doubt as to what the rights would have been between Fine and Penn, but we don't have that here. Here we have the Government in the very sound position of a creditor * * *.*" (Emphasis supplied.)

A fair inference from this statement is that the District Court, in its Oral Opinion[8] held Fine to be the owner of the cloth as far as Penn was concerned and Penn to be the owner as far as the government was concerned. Well, if Fine was the owner as far as Penn was concerned it was the owner as far as the government was concerned. The government's right under Section 6321 of the Internal Revenue Code of 1954 rises no higher than the rights of the taxpayer in the property sought to be distrained.

Section 6321 expressly provides that a perfected lien for taxes attaches to "all property and rights to property, whether real or personal, belonging to" a delinquent taxpayer.

Expressing cognizance of the provisions of Section 6321, the District Court, in its Oral Opinion, found that Fine "at no time * * * have what we call property in these goods"; that it had

---

6. Par. 8 "Findings of Fact" set forth in Note 1.

7. Par. 10 "Findings of Fact".

8. As earlier stated, the District Court in its written Conclusions of Law directed

that the fact findings made in its Oral Opinion "shall be and become a part of these Findings of Fact and Conclusions of Law."

merely extended its "credit on behalf of Penn" and that Penn was at all times the owner of the cloth.

In its written Conclusions of Law (Par. 3) the District Court made the fact finding that "title to the cloth in question was always in Penn Garment Company".

The record affords no support for the findings cited and they are "clearly erroneous".

The bill of sale evidences that the cloth was sold to Fine, the record discloses that Fine paid Reeves for the cloth in consonance with the terms of the bill of sale and the District Court itself found, in Par. 8 of its written Findings of Fact, that Fine "entered into two purchase contracts with Reeves Bros., Inc. for the purchase of the required cloth", and in Par. 10 that "Payment for the cloth was made to Reeves Bros., Inc. by Fine Fashions, Inc."

It must be noted that the District Court in its Oral Opinion indicated that the "control" which Penn had over the cloth evidenced its "ownership". In doing so it said:

> "Control is very close to ownership * * * the ownership is a right to its possession, use, and enjoyment, and to sell or otherwise dispose of it at the will of the owner. The owner is the person in whom is vested that combination, and the title to the property."

It is a fair assumption from the foregoing that the District Court considered Fine's placing of the cloth in the possession of Penn as a vesting of title to the cloth in Penn.

The law to be applied in determining who owned the goods is state law. Aquilino v. United States, 1960, 363 U.S. 509,

512–513, 80 S.Ct. 1277, 4 L.Ed.2d 1365; United States v. Bess, 1958, 357 U.S. 51, 55, 78 S.Ct. 1054, 2 L.Ed.2d 1135. In the instant case it is the law of New Jersey: although various transactions affecting the physical transfer of the cloth from Reeves to Penn occurred in New York, the cloth is located in New Jersey and the conflict-of-laws rule of that state is that title to personal property is determined by the law of the situs, Schmidt v. Perkins, Ct.Err. & App. 1907, 74 N.J.L. 785, 67 A. 77.

In determining whether Penn had title to the cloth we are to be guided by the intentions of the parties, by the accepted usages of the trade, and by the actual conduct of the parties. Uniform Sale of Goods Law, N.J.Stat.Ann. Title 46, Sec. 46:30–24(2) (1940).

It is clear that Fine acted here as a matter of "accommodation" to Penn in purchasing the cloth from Reeves. Par. 7, Stipulation of Facts; Par. 5, written "Findings of Fact".

Fine did not sell the cloth to Penn; when Penn received the cloth it was not pursuant to any undertaking on its part to pay Fine for the cloth; in other words there was no contract of sale; there was only in substance a consignment of the cloth, owned by Fine, to Penn, for the purpose of its manufacture into nurses' uniforms with ultimate reimbursement to Fine for its cost of the cloth when the government paid for the uniforms.

Consignments are recognized in New Jersey.[9]

One of the critical elements of a consignment is the absence of obligation (as here) on the part of the consignee to pay the consignor for the merchandise it receives. Riedinger v. Mack Machine Co., Ch.1934, 117 N.J.Eq. 334, 175 A. 790.[10]

---

9. Riedinger v. Mack Machine Co., Ch. 1934, 117 N.J.Eq. 334, 175 A. 790; see Shapiro v. Marzigliano, App.Div.1956, 39 N.J.Super. 61, 120 A.2d 490.

10. In Riedinger v. Mack Machine Co. where a consignment was involved, the Court said (175 A. 793):
"Lastly, the contract before me lacks the distinguishing feature of a contract of sale, namely, an absolute obligation by the purchaser to pay for the goods."

Another critical element is that the proceeds of the consigned merchandise on its sale must be segregated, 2 Williston, Sales, Sec. 338 (rev. ed. 1948). Here, by Penn's assignment to Linde, the proceeds of the sale of the nurses' uniforms (manufactured from the cloth), were segregated from Penn's general funds.

The emphasis placed by the District Court on Penn's possession of the cloth as evidence of its ownership is in disregard of the New Jersey law that the presumption of ownership from possession is rebuttable, Spagnuolo v. Bonnet, 1954, 16 N.J. 546, 109 A.2d 623; Burr v. Bloomsburg, Ch.1927, 101 N.J.Eq. 615, 138 A. 876.

In the instant case Par. 7 of the Stipulation of Facts clearly establishes that Penn's possession of the cloth was for the limited purpose of its manufacture and sale of nurses' uniforms to the government pursuant to the terms of the assignment made to Linde and Linde's letter of July 2, 1957.

Par. 7 reads as follows:

"As an accommodation, Petitioner [Fine] informed Louis Wolfe [Penn] of its willingness to purchase from Reeves the material, referred to herein as blue chambray cloth, required under the contract referred to in Paragraph 1 and *to make the same available to Penn solely for the purpose of said contract.*" (Emphasis supplied).

There isn't an iota of evidence in the record to the contrary.

For the reasons stated I would reverse the judgment of the District Court.

I think these comments must be made:

The Assignment of Claims Act of 1940 as amended May 15, 1951, 65 Stat. 41, provides that where assignment has been made and notice of it given to the government the proceeds of such contract "shall not be subject to reduction or set-off for any liability of any nature of the assignor to the United States or any department or agency thereof which arises independently of such contract, or hereafter for any liability of the assignor on account of * * * (4) taxes, social security contributions, or the withholding or nonwithholding of taxes or social security contributions, whether arising from or independently of such contract."

It may well be that the contract between Penn and the government in the instant case contained provisions relating to set-off and if so the levy for taxes would have been invalid as a consequence. Counsel for Fine Fashions, however, neither in the District Court nor on this appeal presented this issue and the failure to do so passeth understanding.